THEODORE SABELIS AND MARY A. SABELIS, PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 82674.    Filed March 9, 1962.

Dean W. Mullin, Esq., for the petitioners.
James D. Webb III, Esq., for the respondent.

FISHER, Judge: Respondent determined deficiencies in income tax of petitioners as follows:

| Year | Deficiency |
|---|---|
| 1955 | $484.72 |
| 1956 | 488.91 |
| 1957 | 584.96 |

The basic issues presented are: (1) Whether, during the years in question, petitioners in operating Circle S Breeding Farm were operating a trade or business, and (2) if they were operating a trade or business, the amounts of deductions allowable in determining net losses for said years.

FINDINGS OF FACT.

Petitioners, husband and wife, filed their joint income tax returns for the years 1955, 1956, and 1957 with the district director of internal revenue, Tacoma, Washington.

The petitioners during the years in issue claimed losses from the activities of an alleged breeding and training farm as deductions from adjusted gross income on their returns as follows:

### 1955

Income:

| | | |
|---|---:|---:|
| Fertilizer | | $36. 91 |
| Expenses: | | |
| Labor | $794. 72 | |
| Feed | 680. 44 | |
| Machine hire | 30. 00 | |
| Supplies | 10. 82 | |
| Shoeing | 126. 29 | |
| Fertilizer and lime | 50. 00 | |
| Veterinary and medicine | 93. 68 | |
| Outside labor and miscellaneous | 115. 45 | |
| | | 1, 901. 40 |
| Loss | | (1, 864. 49) |

### 1956

Income:

| | | |
|---|---:|---:|
| Boarding horses | | $205. 00 |
| Expenses: | | |
| Labor | $870. 00 | |
| Feed | 887. 86 | |
| Depreciation | 40. 00 | |
| Shoeing | 139. 92 | |
| Veterinary | 95. 50 | |
| Miscellaneous | 5. 35 | |
| | | 2, 038. 63 |
| Loss | | (1, 833. 63) |

### 1957

Income:

| | | |
|---|---:|---:|
| Boarding horses | | $603. 30 |
| Riding lessons | | 192. 00 |
| Fertilizer | | 57. 00 |
| | | 852. 30 |
| Expenses: | | |
| Labor | $885. 50 | |
| Feed | 959. 45 | |
| Machine hire | 32. 65 | |
| Supplies | 51. 80 | |
| Repairs | 471. 56 | |
| Boarding | 47. 50 | |
| Veterinary | 130. 68 | |
| Shoeing | 141. 53 | |
| Taxes | 26. 80 | |
| Dues and advertising | 27. 20 | |
| Depreciation | 70. 70 | |
| | | 2, 745. 37 |
| Loss | | (1, 893. 07) |

The respondent disallowed deduction of the losses with the following statement:

It has been held the loss claimed on your return from the operation of the Circle S Breeding Farm does not represent a deductible loss incurred in connection with operations carried on as a trade or business.

Petitioners reside at 220 Alder Avenue with their two daughters Karen and Joyce. Karen was 11 years old in 1955. The property on which the petitioners reside has approximately 300 feet on Alder Avenue and is approximately 3 acres in area. The property was purchased in 1952. The petitioners fenced and seeded the pastures and in 1954 built the barn. One corner of the property is occupied by two residences. The petitioners reside in one residence and Theodore Sabelis' mother resides in the second residence. The balance of the property is used in the farm operation and for Karen's 4–H projects. It is comprised of approximately 2½ acres and is fenced and crossfenced into four separate areas, three of which are pastures. The fourth area contains an exercise ring for horses, with floodlights, a horse barn with stalls for six horses, a grain room, and space for horse trailers.

The husband is employed full time as the manager of the Puget Sound Bulb Exchange in Sumner, Washington. He travels about 5 months out of each year on business and does not devote much time to the farm. The activities of the husband on the farm included some fencing, and helping his daughter Karen when she got behind in her work on the farm. He furnished the funds for purchase of the farm, equipment, and brood mares.

The wife, Mary A. Sabelis, has a family background around horses and she rode horses prior to her marriage to Theodore. The ownership and operation of a farm was something that she always wanted to do.

During part of each of the years in question, Mary was engaged in outside clerical work. She tried to limit this work to those periods of each year when the horses needed the least attention. She worked outside for about 8 months of the year 1955 and part time in 1956 and 1957.

At the farm, Mary supervised the feeding of the horses, determined proper food mixtures, did the greater part of the feeding, decided when the horses were to go into and out of the barn, gave riding lessons in 1957 on weekends and after school on weekdays, took telephone calls, talked to people about the horse market, assisted in foaling, and cleaned and washed blankets and equipment such as feed and water tubs. Riding lessons were discontinued when it was found that they were unprofitable.

Karen is an expert rider and trainer of horses as hunters and jumpers. Such training was one of the activities of the ranch and was entirely handled by Karen. Karen also did most of the cleaning and care of the horses and helped generally with the farm operations.

Karen engaged in 4–H projects in each of the years in question which were to some extent integrated with the operation of the ranch.

4–H Club activities are designed to teach rural and urban youths better ways of pursuing agricultural and home enterprises. The activities are primarily an educational program for youths ages 10 to 21 administered through the National Agricultural Extension Service. Each club member has a project such as the raising of a horse or the training of a horse. The member keeps a record book of the project, the story and plans of the project, work done, the income or value of the product produced, and the expense of the product. The 4–H Club member does all the work on the product except that an adult counselor is permitted to assist. The primary purpose of the 4–H Club and its projects is to educate the member.

In 1955 there were four horses on the farm, a Swaggert roan brood mare purchased for $200, a chestnut foal, a Palomino brood mare purchased for $150, and a roan Tennessee Walking horse purchased for $150. In 1956 the same four horses were on the farm.

In 1957 the farm had the following horses: Swaggert brood mare, the Palomino brood mare, a chestnut thoroughbred horse purchased for $250, a chestnut colt, and a chestnut thoroughbred mare which was leased to Karen from the Washington Horse Breeder's Association as a 4–H Club project.

During the operation of the farm the petitioners have sold two horses. The first horse sold was a chestnut for $350 in 1958. The second horse sold was a bay thoroughbred filly for $1,800 in 1959. The filly was the foal of the chestnut thoroughbred brood mare which was leased to Karen for a 4–H Club project.

The claimed expenses of the farm were based on canceled checks retained for the year in which paid. All of the expenses of the farm were paid by check.

During the years 1953 to 1957, inclusive, at least one of the horses on the farm was a 4–H Club project of Karen. The expenses of Karen's 4–H Club projects were part of the overall expenses claimed as business expenses on the tax returns for operating the farm.

Several of the horses on the farm were registered in Karen's name, but were in fact owned by petitioners.

The labor expense claimed in the operations of the farm during the years 1955, 1956, and 1957 were, in substantial part, wages paid to Katie Michner. A substantial part of such wages were for household work, although Katie also kept an eye on the horses while the husband

and wife were working. The farm had no other employees except occasional laborers or helpers.

The hunters and jumpers which Karen trained were shown in horse shows in which ribbons and trophies were given as prizes. One of the objects in showing hunters and jumpers was to interest prospective buyers.

The operations of the Circle S Breeding Farm (except for residence use and Karen's 4-H projects) were intended to be and in fact constituted a trade or business operated for profit for the years 1955, 1956, and 1957.

While no net profit was earned in the years in issue, there was a profit potential for the future with respect to breeding, sale, and training of horses.

The amounts allowable as deductions in determining petitioners' loss from the operation of the farm for the years in question are as follows: 1955—$1,045.77; 1956—$1,121.25; and 1957—$1,509.95.

### OPINION.

Petitioners urge that they are entitled to the allowance of the deductions claimed as losses incurred in a trade or business under the provisions of section 165(a) and (c)(1) of the Code of 1954.

Respondent's basic position is that the operations of Circle S Breeding Farm were not for profit and, therefore, did not constitute a trade or business.

The issue is essentially one of fact, and the burden of proof rests with petitioners. Except for part residence use and part use for Karen's 4-H projects, we hold that petitioners have met this burden. We think the evidence clearly demonstrates the intent to operate the farm as a business and for profit and that the farm operations demonstrate that the farm was actually operated as a business for the purpose of profit. That there was no net profit in the years in question is not determinative since the evidence supports the inference that the business had a profit potential from the breeding, sale, and training of horses even though some time might elapse before realization of net profit. We hold for petitioners on this basic issue.

Respondent next contends that, if we hold that petitioners were engaged in a business operation, not all of the expenses claimed are attributable to the operation of such business. We agree generally with this view, but, we think it clear that the record supports the conclusion that a substantial part of the expenses claimed are attributable to the operation of the business. Neither party has furnished us with a proposed allocation and we, on the record, cannot make a precise determination. We think, however, that this is a proper case for applying the principles of *Cohan* v. *Commissioner*,

39 F. 2d 540 (C.A. 2, 1930). This entails an exercise of our own judgment in connection with which we eliminate any expenses attributable to residential use and 4–H activities of Karen (to be discussed *infra*).

Upon careful review of the record and application of the principles referred to above, we think the evidence supports an inference that the expenses attributable to the business were at least as follows: 1955—$1,045.77; 1956—$1,121.25; 1957—$1,509.95. These amounts represent 55 percent of the expenses claimed in each of said years.

Petitioners do not argue that expenses for residential use are deductible. In the deductions claimed, however, they attributed all of the wages of Katie Michner to the business. The burden rests with petitioners to prove the extent to which allowance may be made. The record clearly demonstrates that a substantial part of her wages were for services as a domestic, although some part was attributable to the business. The amounts paid for services as a domestic are obviously not allowable. Again, no allocation is suggested, but, we have taken this factor into consideration in determining, *supra*, the amounts properly allowable.

The same may be said with respect to the expense entailed in Karen's 4–H projects. It is true that her 4–H activities to some extent were integrated with her activities in connection with the operation of the farm business. The 4–H projects were educational in character, however, and, therefore, personal within the meaning of section 262. It is clear that expenses attributable to feeding and maintaining horses for her projects are not allowable, even though she also was active in the operation of the business. Petitioners do not appear to question this principle, but nevertheless have charged such project expenses to the farm business. The burden rests with petitioners to prove what part of such expenses are properly attributable to the farm business. Since no allocation has been suggested, we have again taken this factor into consideration in determining, *supra*, the amounts allowable.

*Decision will be entered under Rule 50.*