Kenneth B. SCHLEY, Jr., and Frederick J. Hart, Executors of the Estate of Ellen R. Schley, Deceased, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 3, Docket 29992.

United States Court of Appeals Second Circuit.

Argued Oct. 20, 1966.

Decided March 17, 1967.

Waterman, Circuit Judge, dissented.

Joel A. Wolff, Newark, N. J. (George R. Sherriff, and Joseph T. Higgins, New York City, of counsel, on the brief), for petitioners.

Howard M. Koff, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Meyer Rothwacks and David O. Walter, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before WATERMAN, HAYS and ANDERSON, Circuit Judges.

HAYS, Circuit Judge:

The executors of the estate of Ellen R. Schley petition for review of a decision of the Tax Court which upheld the Commissioner in denying Mrs. Schley an income tax deduction and assessing a tax deficiency in her income tax payments for the years 1959–61. The Tax Court's memorandum findings of fact and opinion are not officially reported.

The issue on this petition is whether the taxpayer is entitled to an income tax deduction for losses incurred in the operation of a farm during the years in question. Petitioners claim that this deduction was proper under Sections 162 (a) and 165(a) and (c) of the Internal Revenue Code of 1954. These sections provide:

§ 162. *Trade or business expenses.*

(a) *In General.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.

\* \* \* \* \* \*

§ 165. *Losses.*

(a) *General Rule.*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \*

(c) *Limitation on Losses of Individuals.*—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business. \* \* \*

The Tax Court found that Mrs. Schley's farming activities did not constitute a trade or business within the meaning of the statute since they were not carried on with the motive of realizing profits.

The facts are not in substantial dispute. The taxpayer's husband, a stockbroker, purchased the farm in the late 1920's, assembling a tract of approximately 660 acres. Ten acres were set aside for residential use, 250 were put under cultivation, 350 were used for pastureland and the rest was woodland. Mrs. Schley occupied a twenty-five or thirty room house on the farm.

In the early 1930's Mr. Schley, who died in 1944, began building a breeding herd, keeping records of quality, pedigree and similar characteristics so that his stock could be sold for breeding rather than for consumption. This herd was continued until 1955 when Mrs. Schley began raising "commercial" cattle in order to cut her expenses. A commercial herd requires less attention and is less expensive to maintain than a breeding herd.

The farm was managed by one Frank Stout from 1929 until his death in 1959. Stout was an "old fashioned" farmer reluctant to seek the advice and recommendations of government agricultural representatives. Since he was not aware of many new techniques and did not believe in receiving payments from the government, many of the technical assistance and relief programs offered to the farmers in taxpayer's area were not used on her farm.

Robert Philbrook took over as manager after Stout's death. Philbrook consulted the county agent, asked him to visit the farm and requested that he be placed on the agent's mailing list so that he would receive recommendations concerning crop varieties, fertilizers and other problems. Philbrook also consulted other agricultural authorities in an effort to make the farm more productive. In 1963 the county agent prepared a comprehensive report, at taxpayer's request, explaining how to improve general efficiency in operating the farm. Although most of these suggestions were later followed, the county agent testified that "even if it [the farm] is utilized properly to the nth degree, the profit will not be too great."

Extensive books and records of the farm operation were kept but they were not shown to Philbrook and he had no idea of the extent of the losses. On the other hand, the taxpayer did receive quarterly reports concerning the farm from the accountants who kept the farm's books. She also participated in some of the decisions concerning the farm and occasionally consulted with the manager.

Continuous losses were incurred in operating the farm each year from 1935 through the years in question, and thereafter. Since 1953 the net loss each year was never less than $10,000. In 1959, '60 and '61, the total loss incurred was in excess of $42,000.

Taxpayer's adjusted gross income for the years in question, exclusive of the claimed losses, was as follows:

1959—$93,259.91
1960—$94,470.57
1961—$94,446.29

Finding that Mrs. Schley had been raised on a farm and had a strong attachment to a farming atmosphere, the Tax Court held her continued operation of the farm despite the history of more than twenty-five years of increasing losses was motivated by her love for the farm and the comfort of her life there rather than by a desire for profit.

Petitioners agree that the losses in question are not deductible unless the farm operation was motivated by a desire for profit. Lamont v. Commissioner of Internal Revenue, 339 F.2d 377, 380 (2d Cir. 1964); see generally 4A Mertens, Law of Federal Income Taxation, § 25.08 (1966). However, they challenge the Tax Court's finding that Mrs. Schley lacked a profit motive and cite testimony that might support a different conclusion from that reached below.

In a case such as this the inferences drawn from undisputed basic facts by the Tax Court must be sustained unless "clearly erroneous." Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 289–291, 80 S.Ct. 1190, 4 L.Ed. 2d 1218 (1960); Lamont v. Commissioner, supra, 339 F.2d at 380–381; Austin v. Commissioner, 298 F.2d 583, 585 (2d Cir. 1962). The standard to be used in applying this rule has been defined by the Supreme Court:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v.

United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

 In the instant case we are left with no such conviction. Evidence of businesslike management and efforts to improve efficiency of the farm operation does not by itself establish profit motive. Lamont v. Commissioner of Internal Revenue, supra, 339 F.2d at 379–680. Such evidence is equally consistent with a finding that Mrs. Schley was attempting to diminish her losses on what was essentially a hobby. "The totality of circumstances"—including the taxpayer's background, her love of the farm, her substantial independent income and the magnitude of the losses incurred for more than 25 years—indicates that she operated the farm with no expectation of profit and "justifies the conclusion of the Tax Court that a profit motive was lacking." Id. at 380.

Petitioners claim that the Tax Court's decision in Ralph A. Mauller, Dec. 28,014 CCH Tax Ct. Mem. (1966) is inconsistent with the result reached here. The facts of that case are vastly different; the petitioner had suffered losses for only three consecutive years and the losses were much less substantial than here. Nothing said or decided in Ralph A. Mauller suggests that the Tax Court's decision in this case is clearly erroneous.

The judgment of the Tax Court is affirmed.

WATERMAN, Circuit Judge (dissenting).

With great deference to my colleagues I must dissent from their affirmance of the result the Tax Court here reached in disallowing claimed deductions for business income.

No doubt it will appear strange that I differ from them inasmuch as Congress has bound all three of us in our appraisal of the facts [1] found by the lower court by the same United States v. United States Gypsum Co. rule of review cited and quoted by the majority, and by the further limits placed upon the independence of a reviewing court by Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 289–291, 80 S.Ct. 1190 (1960), wherein the "clearly erroneous" rule must also be applied to the lower court's "factual inferences from undisputed basic facts." [2]

Nevertheless, as I have a "definite and firm conviction that a mistake has been committed," I would remand to the Tax Court with instructions to allow as deductions in computing her net income the losses taxpayer [3] incurred in her farming operations during 1959, 1960, and 1961.

Ellen Schley was an extremely fortunate woman. She enjoyed an independent annual income from investment sources of $90,000 or thereabouts during each of the taxable years 1959, 1960, and 1961, and she lived in an area of the "Garden State" which, though threatened by it during the late years of Mrs. Schley's life, had not by 1961 become an irrevocable part of the great suburban and exurban sprawl that lies easterly of agricultural Somerset County toward the

1. Fed.R.Civ.P. 52(a) is made applicable to the review of decisions of the Tax Court by Section 7482(a) of the 1954 Internal Revenue Code, 26 U.S.C. § 7482(a), formerly Section 1141(a) of the 1939 Internal Revenue Code.

2. "Where the trial has been by a judge without a jury, the judge's findings must stand unless 'clearly erroneous.' Fed. Rules Civ.Proc. 52(a) * * *. The rule itself applies also to factual inferences from undisputed basic facts, * * * as will on many occasions be presented in this area. * * * And Congress has in the most explicit terms attached the identical weight to the findings of the Tax Court." 363 U.S. 291, 80 S.Ct. 1200.

3. The actual taxpayers are the executors under the will of Mrs. Schley. For convenience, the Tax Court and the majority treat Mrs. Schley as the "taxpayer." She was living during the years at issue here and the returns under examination were hers.

Greater New York-Newark megalopolis.[4] Mrs. Schley had been reared on a farm, had a strong attachment to things and scenes bucolic, and unlike many less fortunate people, was able to do what she loved to do—in her case to run a farm. She had no other trade—no other business.[5] But even if she were a broker, she could have also maintained deductible farm "business losses." See Folker v. Johnson, 2 Cir., 230 F.2d 906, 907, fn. 2.

On a 10-acre plot of northern New Jersey farmland at Far Hills in Somerset County, she dwelt in a relatively new commodious brick house, surrounded by lawns and flower and vegetable gardens. She conducted her farming activities on some 650 additional acres, divided 250 acres in tillage, 350 acres in pastureland, and 50 in woodland, which was a composite of five dairy farms purchased during the 1925–1935 decade by her investment broker husband, who had died in 1944.

The issue here is a very simple one. Taxpayer took deductions under IRC (1954) § 162(a) for her farming expenses. The Commissioner concedes that the expenses were incurred and that they were paid as claimed. Taxpayer says these expense items were occasioned in the course of carrying on her business of .farming. The Commissioner maintains they were not so occasioned because taxpayer was not carrying on a business of farming. Both parties agree that taxpayer's farming activities had been going on [6] ever since her husband's death. The single issue, therefore, is whether the farming activity that required those expense items was a business activity of

---

4. However, the inroads of suburbia became very evident after 1961 when there began to be demands for gravel and for sod, including an inquiry of April, 1964, about the availability of gravel for superhighway and other highway construction needs. For example, Interstate superhighways 78 and 287 are to intersect within five miles of the Schley 664 acre "Field Farm," located largely in Bedminster, Somerset County. Some 85 acres are in Lamington and Oldwick in Hunterdon County.

5. Though it was stated on her income tax returns for 1959 and 1960 that she was a "partner" in the Wall Street brokerage firm of Moore and Schley, her deceased's husband's firm, it is undisputed that she had no active connection therewith.

 One who receives income from the receipt of dividends from corporate stock or bond coupons or who personally handles one's own portfolio of personally owned investment securities but who takes no active part in the mangement of the corporations in which the investments have been made, and does not hold himself out as a dealer in investment securities, is not carrying on a "trade or business." See Dalton v. Bowers, 287 U.S. 404, 53 S.Ct. 205, 77 L.Ed. 389 (1932); Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397 (1932); CIR v. Smith, 17 T.C. 135 (1951), rev'd, 203 F.2d 310 (2 Cir.), cert. denied, 346 U.S. 816, 74 S.Ct. 27, 98 L.Ed. 343 (1953).

 Activity involving the protection or enhancement of one's investments, or otherwise involving their management, however extensive or time consuming, has been held not to constitute a separate trade or business. Wheeler v. Comm'r, 241 F.2d 883 (2 Cir. 1957); Thomas Reed Vreeland, 31 T.C. 78 (1958); H. Beale Rollins, 32 T.C. 604 (1959), aff'd, 276 F.2d 368 (4 Cir. 1960); Morris Abrams, T. C. Memo. 1962–190. 5 Mertens, Law of Federal Income Taxation, § 30.25, fn. 45.

6. Inasmuch as the farming activity had been continuous over many years any changes in its character that might result in heavier-than-usual expenses in the nature of temporary change-over expenditures is permissibly explainable (if the activity is a trade or business) as "attributable to the operation of a trade or business regularly carried on by the taxpayer"; and the expenditures are deductible and are not otherwise suspect as not being truly business expenditures. See Mayrath v. CIR, 41 T.C. 582, 589–590, aff'd, 357 F.2d 209 (5 Cir. 1966); Koons v. CIR, 35 T.C. 1092, 1100.

 Also, as the intention of the taxpayer at the outset of the venture is one of the criteria usable in determining whether the venture is a business venture, see 5 Mertens, Law of Federal Income Taxation, § 28.73 and fn. 94, it was proper to consider the back history of the Schley farming activity. On this issue it was clear that the Schleys, in 1934 when they started farming, had a definite intention to go into the business of breeding Black Angus cattle for profit.

hers, or something other than a business activity, some other kind of personal activity, as, for instance, an avocational activity, perhaps, or a hobby, or a philanthropy, or a pleasant time-killer to relieve a dowager's boredom.

The Commissioner and the Tax Court avoid the necessity of labeling taxpayer's farming activities as any of these because, first, the burden is upon the taxpayer to show that the activities were within the statutory coverage and not upon the Commissioner to show that they were not;[7] and, second, that as taxpayer failed to satisfy that she had a "genuine profit motive" in conducting her farming activities she failed to show that these activities constituted the carrying on of a business.

The statute says nothing about a taxpayer's motives, but says only:

"In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business * * *."

But there has been an assumption that only individuals harassed and nagged by acquisitive drives are "in a business." However, to be in business one need not have a reasonable expectation of profit or need not realize a profit immediately. One is in business if his activities have been entered into and are carried on in good faith for the purpose of making a profit. Lamont v. Commissioner of Internal Revenue, 339 F.2d 377, 380 (2 Cir. 1964). As is quoted in 5 Mertens,

Law of Federal Income Taxation, § 28.72, with reference to farming businesses, "It has been said that 'if losses, or even repeated losses, were the only criterion by which farming is to be judged a business, then a large proportion of the farmers of the country would be outside the pale. It is the *expectation of gain, and not gain itself* which is one of the factors which enter into the determination of the question.' Samuel Riker, Jr., 6 B.T.A. 890, 893." Here taxpayer's petition to the Tax Court was pitched upon the proposition that "The farm was operated as a business for profit and the losses sustained were from the operation of that business." Though taxpayer's evidence failed to convince the Tax Court that the proposition so advanced was supportable, that evidence has convinced me that the farmer here was engaged in business and entitled to take her claimed deductions from her tax returns for 1959, 1960, and 1961.

The evidence was presented to the Tax Court on the pleadings, by a stipulation, by the testimony of five taxpayer witnesses, and by taxpayer exhibits. The Commissioner produced no witnesses and no rebuttal evidence of his own.[8] Although a schedule was in evidence showing gross profits, total expenses (including depreciation), and net losses sustained in the farm operation for each year, from 1935 through 1961, we must approach our problem by looking at the activity for the taxable years in question.[9]

7. It may no longer be questioned that deductions from gross income are purely a matter of legislative grace and the statutory sections authorizing them are to be strictly and narrowly construed. The burden is always upon the taxpayer to prove that his expenses fall within the deduction provisions of the statute.

8. Deductions for expenditures may be allowed solely on the testimony of the taxpayer. Arthur N. Blum, 11 T.C. 101, 110 (1948), aff'd, 183 F.2d 281 (3 Cir. 1950).

9. As our court said in Stoddard v. Comm'r of Internal Revenue, 141 F.2d 76, 80 (2 Cir. 1944), referring to the statutory scheme of income taxation:

Each taxable year is a separate taxable period; different taxes are involved, and

the events of each period are given their significance in tax matters in the light of what actually took place in that taxable year. Whether one is doing business or not within § 23 [the predecessor to 26 U.S.C. § 165] is often a most difficult question to decide and often depends upon the aggregate of many considerations, in themselves perhaps of minor consequence but decisive when taken as a whole. A taxpayer must of necessity prove his actual status in the period in which he seeks an advantage that being in business would give him. It is not a subject which when settled as to one period remains immutable as to another.

Nevertheless, the schedule does demonstrate that the operation had been continuous for 27 years, and though always showing net losses never failed to produce an annual income. Is not this the most important criterion of whether an activity is pursued for profit?

The pertinent figures are: Reported adjusted gross income, exclusive of farm operation losses: 1959—$93,259.91; 1960—$94,470.57; 1961—$94,446.29.

The farm operation:

| | Gross farm profit | Total farm expenses | Net loss on farm operations |
|---|---|---|---|
| 1959 ................... | $6,351.78 | $18,151.04 | $11,799.26 |
| 1960 ................... | 5,384.19 | 20,671.87 | 15,287.68 |
| 1961 ................... | 7,491.52 | 22,537.90 | 15,046.38 |

From the very beginning of the farm operation through 1961 separate books and bank accounts for the farm have been kept by one Charles Meara, an employee of taxpayer's deceased husband's brokerage firm. The books show receipts and expenditures, cattle purchased and sold, cost of supplies, utilities, feed, fertilizers, fuel, seeds and plants, tools, sundry purchases, threshing and baling, veterinarian fees, Social Security tax payments; also a summary of receipts and expenditures by years, depreciation schedules, inventories, etc., hired help, insurance, real estate taxes,[10] auto license taxes, registration of cattle, rent allowances, repairs, and sales of crops.

Not only were the farm operation books of account kept entirely separate from taxpayer's personal living books of account, but even the house and grounds were operated separately from the farm. The grounds were maintained by a caretaker whose salary was paid from taxpayer's personal bank account. The caretaker performed no work on the farm. None of the farm's production was used at the residence, except for a portion of a heifer butchered once or twice a year and divided between the residence and the farm employees.

In contrast with attractive and expensive show places in the fashionable general area about Far Hills, the Schley farm is not a show place but a beef-cattle farm. There is no horse barn, even, the horse stable having been converted into a cattle barn. There are no fancy board fences, elaborate stables or barns. There is no electricity in the barns. The fences are at least 20 years old; and some are woven wire. The barns and fences are badly in need of paint. During 1959, 1960, and 1961, the State of New Jersey issued licenses for farm vehicles at reduced rates. The county agent was authorized to issue them on vehicles actually being used on true farms; and he visited taxpayer's farm and satisfied himself that the activities there met the requirements for receipt of farm vehicle licenses.

Originally, and for the first 20 years of the farm operation, the Schleys had raised Black Angus cattle and had devoted their endeavors to improving Black Angus breeding lines. In 1955 taxpayer converted from the development of the Black Angus breed and began the raising of "commercial" cattle, that is, the growing and fattening of cattle for beef. This was the basic farm activity in 1959, 1960, and 1961. In 1959 taxpayer hired a new manager, Robert Philbrook, who managed the farm in that year and throughout 1960 and 1961, was managing it at the time of the Tax Court hearing

10. In 1961 the local real estate taxes on the farm realty were $6,442.31, or 29% of the total farming expense budget.

in December 1964, and, as far as appears, is managing it now.

Philbrook was a farmer and herdsman, had been a dairy farmer, and was acquainted with the breeding of cattle. In connection with his duties, Philbrook performed the general farm work, cared for the cattle and farm, and directed the work of the two other farm employees, Harrison Philbrook and George Hendershott. As part of their employment, these three men were given the occupancy of houses located on the farm. Upon becoming manager, Philbrook immediately consulted the county agricultural agent and asked him to visit the farm. Philbrook also requested that he be placed on the agent's mailing list for recommendations as to crop varieties, fertilizers, and other problems. During his employment Philbrook has consulted agricultural authorities and adopted their suggestions in an attempt to make the farm more productive.

Taxpayer never showed her farm account books or records to Philbrook; but she, herself, kept a finger on the finances of the operation, and, even though elderly and in poor health, consulted with Philbrook and participated in some of the manager's decisions.

Parenthetically, even as evidence was before the Tax Court relating to the operation before 1959 and before the hiring of Philbrook, so, too, evidence apparently admitted without objection as to its relevancy, was also presented relating to activities on the farm after the taxable year 1961 and up to the Tax Court hearing in December 1964.

This post-1961 evidence was summarized by the court below, speaking as of December 1964, in the court's Findings of Fact as follows:

"In 1963, petitioner had the entire farm surveyed to determine utility, fertilizer needs, improvement of fertility, and drainage. Based on this survey, the county agent made a comprehensive report showing necessary steps which would have to be taken in order to improve general efficiency in operation. Most of these suggestions are now being followed.

"Considerable demand has developed near petitioner's farm for sod, which brings a price of $200 an acre. Petitioner has made efforts, through her farm manager, to negotiate sales of sod from the farm property. However, as of the end of 1964, no sod had been sold.

"There are several gravel deposits on petitioner's farm. These can be removed without adverse effect on the farming operation. The demand for gravel in petitioner's area has increased with the recent construction of new homes in that vicinity. A survey, made by the Eastern Exploration Company, indicates that petitioner may have saleable quantities of gravel. The matter is still under consideration."

On the basis of the foregoing objective evidence, including the evidence relative to post-tax years' possible extractive "cash crops," and upon selected portions of the testimony of three of the five witnesses who testified orally at the hearing, whose testimony will be discussed later, the Tax Court found that:

"Petitioner had been raised on a farm and had a strong attachment to a farming atmosphere. She continued to operate the farm after the death of her husband, notwithstanding its long history of losses, because of her love for the farm and the comfort of her life there.

"Petitioner did not operate, or intend to operate, the farm as a business for profit during the years 1959, 1960, and 1961."

It seems to me tragic that if one loves one's work greatly and loves the environment in which that work is done, one is because of those loves supposed to be devoid of a profit motive in carrying on that work. Though pride of accomplishment and the joy of occupying one's time and interest in work one loves to do may indeed outweigh in a conscientious entrepreneur's mind an inadequate

financial return [11] for that work and the work of his employees, nevertheless, under our economic system he *does* get money for what he sells and he *is* engaged in a trade or business recognizable as such by the tax collector.

So here taxpayer had her business, she loved it, and it occupied her time and her interest. I quote from the Tax Court opinion:

"There is no doubt that petitioner raised beef cattle and operated a farm. The evidence shows that the activities conducted by petitioner are those usually performed by one in the business of cattle raising. She employed tenants to do the manual labor required; she followed the advice of state agricultural specialists; she spent some of her own time supervising the operation; and she saw to it that adequate books and records were maintained. The farm itself was equipped with the necessary buildings and machinery."

Despite this, the court went on to say:

"But the mere operation of a farm is not enough. To qualify as a 'trade or business' within the meaning of the statute and the regulations,[*] the farm must be operated for the purpose of making a profit. It is the expectation of gain that is important. The operation need not produce a profit, but it must be of such a nature that the taxpayer can reasonably expect one. Doggett v. Burnet, 62 App.D.C. 103, 65 F.2d 191, 194 (1933); and Henry P. White, 23 T.C. 90 (1954), affirmed per curiam 227 F.2d 779 (C. A.6, 1955). In other words, were the petitioner's farming and cattle raising activities 'engendered by the motive or

intent of realizing profits'? Lamont v. Commissioner of Internal Revenue, supra. We think not."

[*] [Judge's note] In the Tax Court opinion at this point there is a footnote reading as follows:

"Sec. 1.165–6(a) (2), Income Tax Regs.

"(2) If the taxpayer owns and *operates a farm for profit* in addition to being engaged in another trade or business, but sustains a loss from the operation of the farming business, then the amount of loss sustained in the operation of the farm may be deducted from gross income, if any, from all other sources. [Emphasis supplied.]"

Of course, as has been pointed out above, in this case petitioner was not "engaged in another trade or business," and it would seem that the regulation quoted with emphasis is inapplicable.

In support of its belief that petitioner's activities were not engendered by the motive or intent of realizing profits, the court "carefully considered several pertinent facts." It considered, first, that in December 1964 petitioner was too ill to testify at the hearing. (She suffered from arteriosclerosis and had a fractured vertebra. She died in August 1965.) This was certainly unfortunate for her and her case, for she would have been the best spokesman to tell her intent and motive in 1959, 1960, and 1961.

As petitioner herself could not testify as to her intent and motives in those years the court sought to penetrate her 1959–1961 thoughts as to purpose and motive by considering the oral testimony of three men, her son Kenneth; Philbrook, the farm manager during those years; and Frederick Hart,[12] a partner in her deceased husband's old brokerage firm, and who, after Meara died in 1962 and after the close of the taxable years

11. After payment of taxes, allowances for proper depreciation upon depreciable assets, the setting aside of reserves for the acquisition of new assets to replace the depreciated ones, and "payment" by withdrawal from receipts to himself as manager of the business, how often as not does an entrepreneur show an excess of business "expenditures" over "income"? So, we now examine the entrepreneur's

mind! If he loves his job, that love, and the loss, demonstrates he is not performing a profitable operation or spending his time "for the purpose of making a profit" and hence he is not in a trade or business. But if he hates what he's doing?

12. Kenneth Schley and Frederick Hart are the petitioners here. They are "taxpayer's" executors.

at issue, took charge of the farm books and records.

Kenneth, himself a farmer, testified at length as to his mother's efforts to make the farming operation a paying one, both by affirmatively making more profits, and by decreasing expenses in order to make more profits. He testified that his mother was consulted on all things about the farm operation, that everything was done and experiments were conducted "for the purpose of trying to make a profit" and that if the real estate taxes, one of the largest expenditures, could be reduced, that could, he hoped, make the difference between showing a profit instead of a loss.

The Tax Court, as to Kenneth, only said in its opinion:

"Kenneth, when asked why his mother continued to operate the farm after her husband's death in 1944, replied: 'I'm sure the main reason that she continued the operation of the farm was her own love of the farm itself and her desire to take it on and do the best she could with it. * * *' "

And

"An insight into the pleasure she derived from the farm as compared with any alleged profit motivation was revealed by the testimony of Kenneth when he was asked during direct examination whether at the present time his mother was anxious to pursue the possibility of selling some gravel for cash to a company possibly interested in acquiring it. He replied: 'If she can pursue it with the idea of getting a so-called cash crop in without it ruining her property in any way, well, they want to go ahead with it.' In other words, petitioner would have been willing to increase the farm income only if it did not spoil or interfere with her enjoyment of the property in any way."

I am astonished that only those two isolated bits of Kenneth's testimony, one directly relative to motive in 1944 and the other to motive in 1964 (though put in by the Schley counsel) were acknowledged in the opinion below out of 83 pages of transcript, some of which directly related to the years 1959–1961. I would have supposed that if one attempted to "do the best one could with" a business that meant to do the best one could to make it a profitable going concern; and it should be obvious that when a farmer weighs the desirability of opening a gravel bank on his farm he has to balance the benefit of the cash received per cubic yard against the disruption the extractive industry would do to his agriculturally balanced fields and pastures. To be sure, the owner's enjoyment of the property would be paramount in any event—but the fact that Mrs. Schley, Kenneth and Philbrook were looking into possible gravel sales would seem to me to show a definite desire to make money out of the farm. If they had had no such desire they wouldn't have even considered it. I do not read the record to indicate there had been any 1959–1961 demand for gravel, but there well may have been in view of the increase in the Schley real estate taxes in those years, an increase which one assumes was caused by the need to render more civic services to a fast growing population in Somerset County, which in turn would use nearby gravel deposits for road and house construction needs.

So much for Kenneth.

As for Philbrook, though his testimony appeared in 25 pages of transcript, and was extremely pertinent and vital on the issue of his employer's motives, the court only mentioned that when he was asked why Mrs. Schley was operating the farm he replied: "I think she enjoys farmers. That's the reason she operates it." However, Philbrook also testified:

"Q. Have you ever seen any indication that Mrs. Schley is operating this farm as a hobby or a plaything? A. No. Not since I have been there.

Q. Toward what principal point are you lending all your efforts as manager of the farm? A. Well, I would think that it was to better the farm and put it on a paying basis. * * *"

The period involved in this case was the beginning three years of the period when Philbrook "was there."

Hart advised taxpayer about her securities and her investments. Though he testified that she advised him she was making every effort to put the farm on a paying basis, he also testified in answer to the question: "Do you know why she was operating the farm?" His answer was: "Well, she loved farming; that I know." This last question and answer was all that the court below quoted, although, to be sure, Hart's testimony was short. It wasn't until after 1961 that he apparently had any direct interest in the farm; over the long years from Schley's death in 1944 through 1961, during which Hart was handling the capital that brought in the annual income of $90,000, he had but few visits with Mrs. Schley about it, and those were only of a casual nature. The farm was not *his* problem. Out of this testimony the court below somehow managed to make out that Hart realized that a farming "profit was a matter of indifference to the petitioner." This inference was an extraordinary one. Hart never said he had any such idea; during the years here in question he didn't keep the farm books; and his business with Mrs. Schley was in the world of stocks, bonds, coupons, and investments, and far removed from the condition of the fences in Somerset County, New Jersey.

Summarizing, the court listed the items that persuaded it that, though taxpayer indeed operated a farm, she did so without a genuine profit motive, did so out of love, and did not operate it as a business. These are: The uncontroverted 28 year history of income and expense from 1935 to 1962 inclusive; a disparagement of the management abilities of a farm manager who died in 1959 [but we are interested in Philbrook's managerial years!]; petitioner's close-mouthedness about her affairs because she didn't consult with her manager about the extent of her farm losses [but her managers were not on a profit-sharing basis with her—they were "hired help." She was the boss, and undoubtedly a proud woman. Why *should* she consult—except to discuss operating problems? Her financial condition was not to be bandied about by employees! It would appear she was just as close-mouthed with Hart, who could have had access to her books!]; a finding that the farm suffered "from numerous deficiencies, inefficiency and obvious indifference to profit-making in its overall operation and management" [certainly true as to the upkeep of barns and fences, see p. 753 supra, but rather contradictory and confusing inasmuch as "The farm itself was equipped with the necessary buildings and machinery," see p. 755 supra!]; and a finding that the spread between annual expenditures and annual gross profits, relatively static in recent years, had widened because of steadily increasing expenses.

As is the due of the court below, I accord great weight to these inferential findings of fact, but I find from the whole record, not just selected portions thereof, evidence of such a nature that contrary inferences from those made by the Tax Court are required.

I accept the factual findings made below, but I have pointed out and shall point out that there are important additional facts in the record; and the ultimate inferential finding of fact upon which the case turns, that taxpayer was not actuated by a profit motive in the years in question, is to my mind a "clearly erroneous" ultimate finding. So I have a firm and definite conviction that a mistake was committed when judgment was awarded to the Commissioner.

When lower court determinations are reviewed by the appellate court, the appellate court must look first to the findings of the court below, which I believe I have fully detailed heretofore; then the appellate court may examine all the evidence in the record to ascertain whether those findings are "clearly erroneous." The appellate court, to be sure, must give great weight to the inferences drawn by the trial court, but it is equally true that the appellate court may reject

those inferences if they are clearly erroneous inferences and have led to a mistaken result. 2B Barron & Holtzoff, Federal Practice & Procedure, § 1133, p. 527 (1961 Wright ed.); Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 137 F.2d 176, 181 (5 Cir. 1943).

Whether taxpayer operated her farm for recreation or pleasure or operated it for the purpose of profit or in the expectation of profit is a question of fact to be determined by a consideration of the whole record.[13] If all of the uncontroverted record shows that taxpayer had an intent to operate the farm for the receipt of income and shows that she expended effort to make that income realizable, the fact that there was no net profit in the three year period here in question is not conclusive on the issue of her motive and intent, for some time might elapse before that realization. Theodore Sabelis, 37 T.C. 1058 (1962). And in view of taxpayer's independent investment income and the not inconsiderable cash receipts from the farm (over $20,000 in the three years) she could safely build her business and wait for that realization.

The Tax Court does not apparently credit the uncontroverted testimony of the newly-hired farm manager that when he was hired in 1959 he was hired "with the understanding that I was to see what I could do about trying to put it [the Field Farm] on a paying basis" and that he devoted his efforts toward bettering the income from the property.

The Tax Court made no mention whatever of the lengthy uncontroverted testimony of the County Agricultural Agent, Harold Repair, which covered 70 pages of the hearing transcript. The whole tenor of his testimony was to the effect that taxpayer, her son, and her farm manager, were sincere farmers desirous of getting the highest possible returns out of the property. Among other testimony of his of like import he testified:

" * * * They were disturbed about the income * * * they thought that maybe they were behind the times and it was their particular desire, as much as possible, to get the farm on a paying basis if at all possible. * * * Basically it was to bring the farm into a larger production and overall we hoped to increase the income. * * * Wanted to find out what the farm could be best utilized for, and how they might increase production and, in the overall, increase their income and make the farm as efficient as possible. * * * In my opinion it is just another beef-cattle farm. * * *

Q. * * * is it your belief that the Field farm could be operated profitably? A. I think to a small extent it could be. * * * They expressed to me a desire that they wanted to improve their position income-wise and that they would like to have the recommendations that I would give them to make it a more profitable operation."

Repair also pointed out that no matter what taxpayer could have done to increase productivity in terms of cash receipts the real estate taxes in 1959–1963 would keep the profits down.[14]

13. Within a space of 194 pages of transcript taxpayer cited to 57 pages in support of her request for an ultimate finding of fact that she operated the farm as a business for the purpose of profit and not as a hobby. And supported 176 other requests for findings by direct reference to transcript pages.

14. Repair testified:
"But under the existing conditions today, the income, the profit would be very small because with real estate taxes in our area, up until this past year being as high as they are—this is a terrific item of overhead."
At this point it should be mentioned that taxpayer's farm real estate tax payments, deductible on her income tax return as "Taxes," as well as other income tax deducts available to her from her farming operations, are all included on the expense side of her farm profit and loss statements. The taxes alone are quite an item of expense. See p. 753, supra, and fn. 10.
Though taking place after 1961, the New Jersey legislature in 1964 passed a

Repair's advice and suggestions were not only eagerly sought, but when received were followed. Subsequent to the years in question, but prepared by him because of requests during those years, Repair presented taxpayer and Philbrook with a detailed list of suggestions for improving the efficiency of and the income from the farm. Somerset County's long-time County Agent, acquainted with the farm from 1951 forward, stated in his survey:

> "This farm has always been operated as a good practical beef and crop farm. There has been no effort to waste money on fancy cattle equipment or extra labor. There are times when if a little more had been spent the income might have been greater."

The Tax Court and my brothers rely upon seeming similarities between this case and that of Corliss Lamont, 339 F.2d 377 (2 Cir. 1964), 41 T.C. 926, where we affirmed a Tax Court determination that because Lamont's activities were not engendered by the motive or interest of realizing profits he was not carrying on a trade or business so as to permit of an allowance of income tax deductions claimed by him to be allowable under Section 162(a).

In the Lamont case the reviewing judges were satisfied that the findings and conclusions of the Tax Court were amply supported by the evidence. There the totality of circumstances included the taxpayer's interest in the wide dissemination of his ideas. An inference from his activity that this interest was paramount with taxpayer, and that he was not acting in good faith when claiming that he sought to disseminate those ideas in the expectation of sometime realizing a personal profit out of the dissemination, was surely not "clearly erroneous."

The case is easily distinguishable from the present case—there our court did not demonstrate in its affirming opinion that the Tax Court had not considered in totality all the evidence before it; there taxpayer's total income for 1957 (the year in question) from his alleged business was $488 or thereabouts, and as he claimed a business loss of $11,388.98, his so-called business expenses must have been approximately $12,000, roughly 24 times his business income. There was no suggestion in the record that he was attempting any changes in his activities by the 1957 outlay, either designed to decrease his expenses or to increase his income. The Lamont situation falls into the category of two other attempts to justify alleged business losses, Henry P. White, 23 T.C. 90 (1954), affirmed per curiam, 227 F.2d 779 (6 Cir. 1955), cert. denied, 351 U.S. 939, 76 S.Ct. 836, 100 L.Ed. 1466 (1956), and Morton v. Commissioner, 174 F.2d 302 (2 Cir.), cert. denied, 338 U.S. 828, 70 S.Ct. 77, 94 L.Ed. 503 (1949), which cases are cited by the Tax Court in its opinion here. White, another wealthy taxpayer like Mrs. Schley and Lamont, who sought to deduct "business losses" for two successive years, claimed deductible losses in the operation of a personal laboratory. For the first year he offset laboratory income of $105.10 against laboratory expenses of $19,354.92, and for the second year he offset income of $2502.26 against expenses of $21,023.28. In *Morton*, a successful New York City lawyer attempted to prove that he was in 1942 and 1943 in the business of farming on a "country home" property in Virginia. He received no income whatever from his country home acreage in 1942, the thirteenth year of his ownership of the property, no produce being sold, and in 1943 his gross receipts were $275.00 from the sale of some fruit. He sought to deduct $2850 for 1942 expenses and $3180 for 1943 expenses.

The only other case cited by the Tax Court in support of its result is Doggett v. Burnet, 62 App.D.C. 103, 65 F.2d 191 (1933), where one is cited to page 194

"Farm Land Assessment Act" which gives much-needed tax relief to land "actively devoted to agricultural use" when gross sales of products raised on the land equaled a total of at least $1,000 over a two-year period. Here, the sales far exceeded that amount.

and to the excellent discussion of Judge van Orsdell that culminates in the following language, which is as applicable to taxpayer here as it was to Hugenia Doggett and surely supports taxpayer here just as it supported Miss Doggett:

"The proper test is not the reasonableness of the taxpayer's belief that a profit will be realized, but whether it is entered into and carried on in good faith and for the purpose of making a profit, or in the belief that a profit can be realized thereon, and that it is not conducted merely for pleasure, exhibition, or social diversion.

\* \* \* \* \* \*

"We think a better test to be applied here is whether or not the person engaged in a legitimate enterprise shows a willingness to invest time and capital on the future outcome of the enterprise, whether it be successful or unsuccessful. In the present case appellant for years has been devoting her time and capital to this enterprise, conscientiously believing that in the end it will prove profitable. The business is a legitimate one.

\* \* \* \* \* \*

"It certainly cannot be said that she is conducting this enterprise either as a hobby or for recreation or pleasure; and as said in George v. Commissioner of Internal Revenue, 22 B.T.A. 189: 'The real test is whether the operation was carried on as a business for gain or whether it was carried on for recreation or pleasure. And this question is largely a matter of the intent of the petitioner.' Applying these tests to the case at bar, we find no difficulty in reaching the conclusion that the appellant is conducting a business within the purview of the Revenue Act, and is entitled to the benefit of the deductions claimed."

It is clear that taxpayers Lamont, White, and Morton were motivated by personal pleasure rather than by a desire to be engaged in an income-producing activity. As the gross receipts from those taxpayers' alleged businesses were negligible and were indeed almost non-existent in comparison with the expenses they attempted to deduct in the involved taxable years, there is a compelling inference that their real motives were those of personal pleasure as distinct from engaging in business, see Cecil v. Commissioner of Internal Revenue, 100 F.2d 896 (4 Cir. 1939). Such is not the case here.

The uncontroverted evidence here shows that this taxpayer really operated a farm; that this farm had been a going concern since 1934; that taxpayer upon her husband's death in 1944 was given a life estate in the farm and residence; that meticulously separate farm books of account were kept to keep the farm business entirely separate every year from any personal or security investment books of account; that the farm produced a cash income every year but which was less than the total farm expenses, the ratio averaging about $1.00 of income to $3.00 of expenses in the taxable years here involved; that during those years taxpayer, an elderly woman, was under doctor's care; that in the first of these years a new farm manager was hired who was hired with the understanding that he would see what he could do about trying to put the farm onto a better paying basis, and who during the years in question lent all his efforts to that endeavor; that expert advice was sought and was taken to further that purpose; that the barns needed paint and the fences were not in the best of condition, and to the mind of the county agent perhaps it would have been better farm management not to have been quite so frugal about expenses; that one could have a reasonable expectation that the farm would return a small profit with taxes as heavy as they were, and a larger one with tax relief; that items carried on the "loss" side of the farm ledger included real estate taxes on the farm, that in 1961 those taxes were 29% of total farm expenses and that tax relief is now available; that there are likely gravel deposits on the land and a demand for gravel in the neighborhood; that beginning in 1959 with the advent of the new

manager there was a definite interest in improving all facets of the operation so as eventually to lessen the spread between income and outgo; and that taxpayer was in no way dependent upon the cash income from the farm for her day-to-day personal needs, had lived in the residence since 1934, and loved the farm, farmers, and the farm atmosphere.

I apprehend that the Commissioner was so impressed with the fact that Mrs. Schley had an income of $90,000 a year that, despite the fact that this farming enterprise had all the characteristics of a going farm, and the "profit motive" of its owner would normally be taken for granted, he thought the national revenue required him to determine the deficiencies here in suit.[15]

In view of the disadvantageous light in which taxpayer appears because of her comfortable financial position it is all the more important that the testimony that during the taxable years 1959–1961 very definite moves and efforts were being made to make the farm profitable should have been seriously considered by the Tax Court.[16] See Imbesi v. C. I. R., 361 F.2d 640 (3 Cir. 1966), and in particular 644–645. And see Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 284–290, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), where the Supreme Court declined the Government's invitation to substitute objective tests for the determination of donative intent. Objective undisputed facts were relied upon by the Tax Court here to determine as to this woman who had farmed for 25 years what purpose she had in so occupying her time.

I would reverse the Tax Court.

---

15. Compare, e. g., Theodore Sabelis, 37 T.C. 1058 (1962); Ralph A. Mauller, T.C.Memo. 1966–146 (June 24, 1966).

16. At the risk of being in some manner repetitive, it should be pointed out that there were results brought about by these moves and efforts. The testimony was undisputed and was supported by exhibits that Philbrook and Repair (whose 70 pages of candid testimony was completely ignored by the Tax Court) had been working closely together to make the Schley land more fertile so as to get the maximum amount of production out of each tillable acre and that there had been full cooperation by Philbrook with all interested government agencies. As a result of this obvious interest in making the farm pay, a comprehensive conservation plan for the property was prepared by the U.S. Department of Agricluture in the fall of 1963, a soil test performed by the Rutgers University laboratory experts was completed in 1964, and a suggested Land Use Report was delivered to the taxpayer based upon these valuable surveys. The manager was committed to follow these recommendations. Surely this evidence showed that a "profit motive" must have existed prior to these activities and must have been present during the years here at issue, 1959–1961.

The above mentioned surveys and reports were in addition to the survey and report made earlier by Repair and which the Tax Court commented upon, see p. 754. I also think it significant that Kenneth Schley's testimony is undisputed that during the three-year period from 1961 to 1964 the number of cattle kept on the farm had doubled under Philbrook's management. This testimony was ignored.