WILLIARD AND FLORENCE DEERMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Deerman v. Commissioner
Docket No. 6003-71
United States Tax Court
T.C. Memo 1974-84; 1974 Tax Ct. Memo LEXIS 234; 33 T.C.M. (CCH) 440; T.C.M. (RIA) 74084; April 8, 1974, Filed. Towner Leeper & Jesus Samaniego, for the petitioners. Thomas J. Miller, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent has determined a deficiency in petitioners' Federal income tax for the taxable year ending December 31, 1964, in the amount of $7,954.49. The sole issue for decision is whether petitioners' activity of raising and breeding horses constituted a trade or business in the year 1967. If we make a determination that the horse raising and breeding activity constitutes a trade or business, the loss incurred in 1967 attributable to such business may be carried back to petitioners' taxable year 1964 under the provisions of section 172 of the Internal Revenue Code of 1954. [1] If we find that petitioners' horse operation does not constitute *235 a trade or business, the loss incurred in 1967 is personal in nature and nondeductible. Petitioners would therefore be unable to carry back the loss to the taxable year 1964 and respondent's deficiency notice will be sustained. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. The petitioners, Williard (or Willard) Deerman and Florence Deerman, are husband and wife who maintained their residence in El Paso, Texas, when the petition herein was filed. They filed joint Federal income tax returns for the calendar years 1964 and 1967 with the district director of internal revenue, Austin, Texas. In the years prior to 1966 petitioner Williard Deerman was engaged exclusively in the business of farming and raising cattle. Presently he farms approximately 1100 acres of land; 700 acres of his own land and 400 acres of land owned by other persons. In addition he sells between 800 and 2000 head *236 of cattle each year. Sometime during, or just prior to, 1966 petitioners decided that they could profitably expand their operations by raising and breeding quarter horses such as performance and halter horses. Before firmly committing themselves to this venture, petitioners consulted with knowledgeable horse breeders and trainers. These consultants confirmed petitioners' belief that horse raising and breeding, as they wished to do it, coincided well with their farming and cattle business and could be a very profitable operation. Additionally they were informed of the youth activities of the American Quarter Horse Association which provided a potentially large market for well trained quarter horses such as the types petitioners desired to raise. In the years 1966 and 1967 petitioners acquired most of their horses. Due to their lack of knowledge and experience, a qualified trainer was hired to handle the horse operation. The initial trainer hired failed to control expenses to petitioners' expectations and a new trainer was subsequently employed. By the middle of 1968, petitioners' children, John Fletcher Deerman and Deborah Deerman, had acquired sufficient experience and knowledge *237 of the horse operation that they were deemed capable of taking full responsibility for the training of the horses, which subsequently they did. The children received no monetary compensation for their efforts. Petitioner Florence Deerman (Florence) kept the records of the farm. A separate bank account distinguishing the horse operation from the farming and cattle business was not kept. However, complete and accurate records of the horse operation were readily available. Records were kept of deposits into the bank account indicating what each deposit represented. All expenses were recorded in a similar manner: the amount, what the money was spent for, and to whom it was paid. In addition, Florence kept income sheets on the horses. These sheets indicated which shows various horses were in and how the horses fared in them. Further, a book entitled "Horse Account" was maintained showing all pertinent information in regard to the horse venture. On October 1, 1967, petitioners transferred their horse operations along with their farming and cattle raising operations to Deerman Farms, Inc., the stock of which is wholly owned by members of the Deerman family. The horse operation *238 showed a continued record of losses from 1966 through 1971, reported in the initial years by petitioners as individuals and in later years by the corporation. In 1969, due to unfortunate circumstances, petitioners realized that the horse operation would not become profitable. As a result, a decision to liquidate the horse operation was made. The circumstances which led to this decision came about when two horses, named Skip Fancy Pants and Bum's Barb could not be used for studs. At this time petitioners decided that they could not afford to purchase any other horses for breeding and the decision to liquidate was made. Skip Fancy Pants was bought by petitioners when he was seven months old. He was first shown as a yearling, and later as a halter until he was over two years old. In 1969 petitioners decided to breed two mares to Skip Fancy Pants, and from this point on the horse became uncontrollable, trying to bite anyone near. On the advice of a qualified expert the horse was gelded and subsequently sold. Bum's Barb, the other horse petitioners had originally expected to use for stud, became afflicted with bogged hocks (when the horse was used his hocks would swell) in *239 1969. The veterinarian consulted on this matter informed petitioners that this condition could be passed down in breeding and the horse should be gelded. Bum's Barb, after one unsuccessful attempt to sell the horse, is still for sale and is presently used as a cow horse to work cattle. For the taxable year 1967 petitioners claimed a loss attributable to the horse raising and breeding operation in the amount of $16,336.86, which petitioners carried back to their taxable year 1964 as a net operating loss under the provisions of section 172 of the Internal Revenue Code of 1954. Respondent, in his statutory notice of deficiency dated August 12, 1971, determined a deficiency in petitioners' income tax for the taxable year 1964. This was based upon a determination that the above loss claimed by petitioners was not incurred in a trade or business, but rather constituted a nondeductible personal expenditure. Since the taxable year in issue is 1964, this determination has the effect of reducing the net operating loss claimed by petitioners for the year 1967 and thereby increasing the tax liability for the taxable year 1964. ULTIMATE FINDING OF FACT Petitioners' *240 loss in 1967 attributable to their horse raising and breeding operation is a deductible loss incurred in a trade or business, which may be carried back to the taxable year 1964. OPINION The sole question for decision is whether petitioners' horse operation constitutes a trade or business as that term is used in the appropriate sections of the Internal Revenue Code of 1954. [2]
It is well established that breeding, racing, showing and raising horses for sale may constitute a trade or business. Commissioner v. Widener, 33 F.2d 833 (C.A. 3, 1929), affirming 8 B.T.A. 651 (1927); *241 Wilson v. Eisner, 282 Fed. 38 (C.A. 2, 1922). However, whether such activity constitutes a trade or business in the particular circumstances of each case is determined by whether the taxpayer engaged in the venture with the intention to operate for the purpose of making a profit. Schley v. Commissioner, 375 F.2d 747 (C.A. 2, 1967), affirming a Memorandum Opinion of this Court; Lamont v. Commissioner, 339 F.2d 377 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court. The expectation of making a profit need not be a reasonable one, but the taxpayer must show that the expectation was in fact genuine. Margit Sigray Bessenyey, 45 T.C. 261 (1965) aff'd 379 F.2d 252 (C.A. 2, 1967). The issue presented is essentially one of fact and the burden of proof rests with petitioners. Theodore Sabelis, 37 T.C. 1058 (1962). After closely reviewing all the facts and circumstances in the matter before us, we hold that petitioners have met this burden. They possessed the requisite genuine expectation of realizing a profit from their horse operations and were therefore engaged in the trade or business of raising *242 and breeding horses. We have made this determination on the basis of several factors which weigh in petitioners' favor. Initially we note that the petitioners conducted a thorough preliminary exploration of the type of horse they wished to raise and the potential markets available for this type of horse. We think this is indicative of a genuine profit motive. Irving C. Ackerman, 24 B.T.A. 512 (1931), aff'd 71 F.2d 586 (C.A. 9, 1934). Additionally, the petitioners hired qualified help during the initial years of the operation. Experienced trainers were maintained until the petitioners and their family were sufficiently experienced and knowledgeable in the operation to take over those duties previously undertaken by the hired help. We find this to be a further indication of the petitioners' expectation for an eventual profit. See Theodore Sabelis, supra, and Margaret E. Amory, 22 B.T.A. 1398 (1931).
Moreover we have been swayed by the petitioners' businesslike concern for the economics of the horse venture and their method of accounting for income and expenses. Wilson v. Eisner, supra. The records of the operation *243 were accurate and easily distinguishable from petitioners' farming and cattle business. Petitioner Florence was responsible for the record keeping of the farm. In regard to the horse operation she kept income sheets on the horses, indicating which shows various horses were in and how the horses placed. She kept a record of all deposits in the bank account, indicating what each deposit represented and also a record of expenses indicating what the money was spent for and to whom it went. Additionally a special book entitled "Horse Account" was kept showing all information pertinent to the horse operation. Although no separate bank account was kept, an accurate and complete reconstruction of the income and expenses of the horse operation was easily attainable. Furthermore as indicative of their concern for the economics of this venture, petitioners began liquidating the horse operation when it became apparent that it would not prove to be profitable. [3]
Respondent's position is that the venture did not constitute a trade or business. As indicative of this he points to the record of losses *244 by petitioners. Although we recognize that a history of losses over a period may be an important factor bearing on a taxpayer's true intentions, "the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with the intention to achieve a later profitable level of operation * * *". Margit Sigray Bessenyey, supra, at 274. We are convinced that had it not been for the unfortunate circumstances outlined in the facts of this case, petitioners may well have made a profitable enterprise out of horse raising and breeding. We, therefore, do not consider their record of losses indicative of a lack of intent to realize a profit. Therefore, for all the reasons stated above, we hold petitioners' horse operation to constitute a trade or business for purposes of the appropriate sections of the Internal Revenue Code of 1954. Decision will be entered under Rule 155. Footnotes
1. There is no dispute that if the loss in 1967 is determined to be incurred in a trade or business it may be carried back to the taxable year 1964. ↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. * * * SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; * * * ↩
3. Cf. Amos S. Bumgardner, a Memorandum Opinion of this Court, dated February 10, 1954. ↩