Alden B. Starr and Julia H. Starr v. Commissioner.
Starr v. Commissioner
Docket No. 5630-66.
United States Tax Court
T.C. Memo 1969-35; 1969 Tax Ct. Memo LEXIS 262; 28 T.C.M. (CCH) 167; T.C.M. (RIA) 69035; February 19, 1969, filed Alden B. Starr, pro se, 3460 Curtis Rd., R.D. #2, Syracuse, N. Y. John E. White, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined income tax deficiencies against the petitioners for the years 1963 and 1964 in the respective amounts of $1,540.37 and $1,076.63. The adjustments made by respondent result from the disallowance of claimed deductions for losses sustained by petitioners in connection with a horse farm. The only issue for decision is whether the petitioners *263 are entitled to deduct the losses incurred in the years 1963 and 1964. This depends upon whether the operation of their horse farm constituted the carrying on of a trade or business or a transaction entered into for profit under section 165, Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Alden B. Starr and Julia H. Starr (herein referred to individually as Alden and Julia and collectively as petitioners) are husband and wife, who had their legal residence in Syracuse, New York, at the time the petition was filed herein. They filed joint Federal income tax returns for the years 1963 and 1964 with the district director of internal revenue at Buffalo, New York. In 1949 Alden received a Doctor of Medicine degree from Syracusel University. He then served as an intern at the Polyclinic Hospital in New York City for a year. During the period from 1951 to early 1954, Alden was a resident trainee in psychiatry at the *264 hospital. Upon completion of this training, he and his family returned to Syracuse, where he obtained employment with the Veterans Hospital. Petitioners purchased a 35 acre farm in 1954 for $9,900. The farm, located 15 miles outside the city limits of Syracuse, was on a dirt road and contained two buildings, a house and a barn. Both were in a deteriorated condition. The barn was 30 feet wide and 40 feet long and contained 8 stalls. The residence and the other buildings occupied about four acres. The remainder of the farm consisted of 4 acres of apple trees, 12 acres of pasture, and 15 acres of untillable woodland and brush. The one and one-half story house contained 3 bedrooms, a kitchen, bathroom, living room, and a porch. The area surrounding the residence, though neatly kept, was not landscaped and was not generally attractive. The property was not a showplace. Petitioners purchased this farm because it was adjacent to the City, inexpensive, and adequate, so far as they were concerned, "for the kind of general country living" they desired. Prior to the purchase of the farm, petitioners had no agricultural background or experience. The farm has been the residence of petitioners *265 since they bought it. Alden was called into the Navy for the period from February 1955 to August 1956. In late 1956, after his release from the Navy, Alden joined the Agricultural Extension Service to obtain assistance in operating the farm. In August 1958, petitioners decided to raise, breed, and sell Morgan horses. It was their intent to build up the horse-raising operation by purchasing top quality stock of an early age in order to obtain "higher quality at less cost." From August 168 1958 until October 1963, petitioners purchased five 6-month old fillies, one yearling filly, and two 6-month old colts. Their purchases were as follows: Date
Name
Acquired
Cost
Age
Sex
Broadwall Janie
Aug. 1958
$ 550
6 mos.
filly
Broadwall Stardust
Oct. 1958
825
6 mos.
filly
Windcrest Charm
Oct. 1959
1,050
6 mos.
filly
Townshend Vigilante
Oct. 1959
500
6 mos.
colt
(Died of brain hemorrhage in Dec. 1960)
Townshend Vigilstar
July 1961
500
6 mos.
colt
Townshend Melutante
Oct. 1961
550
6 mos.
filly
Westwold Revel Lea
1962
1,200
Yearling
filly
Equinox Delectable
Oct. 1963
850
6 mos.
filly
(Sold in 1966)
Petitioners *266 planned to raise these Morgan horses until they reached breeding age, breed them, and keep those which met their standards until they obtained a sufficient number to carry on their operation, culling the rest for sale. Morgan horses generally are not bred until they are four years of age. The first of petitioners' horses was old enough to breed in 1963. The first foal was produced in 1964. The following foals were produced between 1964 and 1968: Name
DateFoaled
Glamorgan Christina
1964
Glamorgan Janine
1965
Glamorgan Clivia
1965
Glamorgan Nemesis
1966
Glamorgan Finesse
1966
Glamorgan Clianne
1968
Glamorgan Mr. Revel
1968
For the years 1963 and 1964 the petitioners had seven and eight horses, respectively. Prior to 1958, Alden's only experience with horses was that which he acquired as a boy between the ages of 8 and 16 at summer camp where he learned how to ride horses and take care of them. In 1963, Alden attended a session of the Horseman School in Catasauqua, Pennsylvania, to obtain information with respect to various techniques of breeding, problems in horse management, feeding and nutrition, and other aspects of horse care. He has served as a *267 judge for horse shows and as an instructor in youth riding activities. He has also taken courses in the Tennessee Valley under the auspices of the U.S. Pony Club. He has attended horse shows, institutes, meetings of the Morgan Club, and meetings of the New York State Horseman's Association in efforts to improve his knowledge and skill in raising and breeding horses. As of January 1, 1963, petitioners had three children, a son, Christopher, 10, and two daughters, Katherine, 9, and Autumn, 6. Christopher and Katherine learned to ride horses when the they were about eight years of age. Between the ages of 12 and 14 they were active in the 4-H Club which provided them with instruction in horse showing, training, and horsemanship. Since 1966 they have been involved in the U.S. Pony Club. Because the primary responsibility for training the horses was left to Katherine and Christopher, petitioners have never employed any outside trainers. Petitioners have entered horses in five or six of the major horse shows in New York State for the purpose of advertising their horse farm and to gain a reputation as a breeder of top quality stock. They have won various cash prizes and ribbons at these *268 events. Generally, the horses are ridden by Katherine and Christopher, and occasionally by Alden. During the years in question Alden was employed by the Veterans Hospital and by the Upstate Medical Center of the State University of New York at Syracuse, an affiliate of the hospital. He received wages in 1963 of $6,458.10 and in 1964 of $7,169.20 from the hospital and $6,826.40 and $7,334.56, respectively, from the medical center. In 1963 he also received $105 in wages from the Division of Vocational Rehabilitation of New York. The medical center, under its auspices, also permitted Alden to treat a limited number of private patients. From his limited private practice he received net income in the years 1963 and 1964 in the respective amounts of $1,790 and $1,783. Alden's duties at the medical center and the hospital consisted of teaching, research, clinical activity, and supervision of trainees who are residents in psychiatry. Generally Alden started work at 8:30 or 9:00 in the morning and finished at approximately 3:30 or 4:00 in the afternoon. Alden, Julia, and the three children do all the work in connection with their horse-raising activities. Julia was a registered nurse, but *269 she was not employed during the 169 years in question. She spent a considerable amount of time in taking care of the horses in those years. While Julia and Alden were not qualified to treat any serious disease or ailments which afflict horses, they were competent to do many of the routine, elementary functions performed by a veterinarian. Petitioners did not usually have a veterinarian in attendance when a mare foaled because they were capable of attending to the mares under normal circumstances. As a result of performing many of the routine things normally done by a veterinarian, petitioners have managed to keep their veterinarian bills down and still maintain their horses in excellent condition. For the years 1958 and 1959 the petitioners reported on their Federal income tax returns farm expenses in the respective amounts of $2,255 and $3,300. The farm income for the years 1960 to 1966 was as follows: 170 Nature of Income or Nature of Products Sold
1960
1961
1962
1963
1964
1965
1966
Apples
$125
$27
$127
$175
$125
$35
-0-
Nursery Plants
55
57
23
105
-0-
-0-
-0-
Prize Money
-0-
16
10
27
-0-
-0-
$60
Siamese Cats
-0-
-0-
-0-
200
175
125
-0-
Trailer Rental
-0-
-0-
-0-
30
-0-
-0-
-0-
Horses
0
0
0
0
[1] 850
0
[2] 2,750
Breeding Fees
-0-
-0-
-0-
-0-
150
225
-0-
Machine Work
-0-
-0-
-0-
-0-
50
-0-
-0-
Grain Hay -0-
-0-
-0-
-0-
-0-
19
-0- $180
$100
$160
$537
$1,350
$404
$2,810
*270 171 1960
1961
1962
1963
Labor hired
$90.00
$174.00
$600.00
$122.00
Repairs & maintenance
-0-
151.77
85.16
141.83
Interest
384.26
568.00
368.00
280.00
Feed purchased
719.70
705.90
1,494.00
918.00
Seeds, plants purchased
512.49
461.42
9.60
152.00
Fertilizers, sprays, lime
121.00
-0-
33.00
18.00
Machine hire
10.00
-0-
600.00
-0-
Supplies purchased
162.51
366.95
186.00
101.35
Breeding fees
-0-
-0-
300.00
300.00
Veterinary, medicine
25.00
201.60
412.00
350.00
Gasoline, fuel, oil
130.00
67.00
385.00
187.00
Taxes
50.00
50.00
50.00
50.00
Insurance
78.00
78.00
40.00
40.00
Utilities
36.00
401.75
180.00
180.00
Rent of farm, pasture
-0-
-0-
-0-
-0-
Freight, trucking
30.00
125.00
290.00
79.60
Advertising, fees & dues
173.17
48.00
170.00
291.00
Straw & bedding
68.00
93.00
362.00
305.00
Farm travel
300.00
300.00
300.00
60.00
Books & magazines
-0-
27.50
-0-
99.00
Blacksmith fees (farrier)
-0-
52.00
185.00
226.00
Express & storage
-0-
63.41
-0-
-0-
Lumber & fence posts
-0-
12.40
65.00
-0-
Education courses
-0-
-0-
51.50
205.00
Harness & equipment
130.00
645.30
-0-
-0-
Fees -0-
-0-
-0-
61.00
Total Farm Expenses
$3,020.13
$4,593.00
$6,166.26
$4,166.78
Depreciation 1,939.70
936.00
1,280.00
2,165.26
Total Deductions $4,959.83
$5,529.00
$7,446.26
$6,332.04
*271 1964
1965
1966
Labor hired
$17.00
$30.00
-0-
Repairs & maintenance
359.08
405.86
$222.00
Interest
280.00
350.00
-0-
Feed purchased
1,440.00
1,603.00
2,227.00
Seeds, plants purchased
-0-
-0-
-0-
Fertilizers, sprays, lime
16.00
150.00
23.80
Machine hire
-0-
-0-
-0-
Supplies purchased
142.00
20.00
82.55
Breeding fees
-0-
-0-
200.00
Veterinary, medicine
454.20
319.00
260.00
Gasoline, fuel, oil
160.00
17.35
25.00
Taxes
50.00
5 0.00
50.00
Insurance
40.00
40.00
40.00
Utilities
200.00
100.00
60.00
Rent of farm, pasture
-0-
16.50
-0-
Freight, trucking
16.55
14.93
-0-
Advertising, fees & dues
244.00
190.00
259.00
Straw & bedding
350.00
364.00
550.00
Farm travel
60.00
-0-
60.00
Books & magazines
4.00
-0-
-0-
Blacksmith fees (farrier)
139.00
96.00
130.00
Express & storage
-0-
-0-
-0-
Lumber & fence posts
-0-
-0-
-0-
Education courses
-0-
-0-
-0-
Harness & equipment
-0-
-0-
-0-
Fees
65.28
-0-
-0-
Total Farm Expenses
$4,037.11
$3,766.64
$4,189.35
Depreciation
1,905.70
2,164.75
1,191.70
Total Deductions
5,942.81
$5,931.39
$5,381.05 172 Petitioners advertised *272 their horses for sale in newspapers and magazines. Illustrative of the type of advertising they did is the following ad which appeared in The Morgan Horse magazine: ViGildon SeLecta LeAder NorMa Ben DOn Rena InGrid PArade DebutaNsque From the Breeding of GLAMORGAN FARM Dr. & Mrs. Alden B. Starr & Family 3460 Curtis Rd. RD #2, Syracuse, N. Y. 13215 Tel.: 315 OR.9-5957 Young Stock For Sale Petitioners kept records of all the expenses of the horse raising operation. Petitioners reported the following receipts, expenses, depreciation and losses on schedule F (Schedule of Farm Income and Expenses) of their Federal income tax returns for 1963 and 1964 in connection with their horse raising activities: Loss
Year
Receipts
Expenses
Depreciation
Claimed
1963
$537
$4,166.78
$2,165.26
$5,795.04
1964
1,350
4,037.11
1,905.70
4,592.81
In his notice of deficiency respondent disallowed the claimed deductions with the explanation that such losses were not allowable under the provisions of section 165. Ultimate Findings of Fact During the years 1963 and 1964 the petitioners were engaged in the business of raising *273 and breeding Morgan horses with the intention of making a profit. Opinion The only issue presented is whether petitioners are entitled to deduct for the years 1963 and 1964 the losses which they incurred in breeding and raising Morgan horses. The resolution of this issue depends upon whether their operations constituted a trade or business so that the expenses incurred in the venture are deductible under section 162 [2] or the losses are deductible under section 165. [3]
Breeding and raising *274 horses for sale may constitute a trade or business. Commissioner v. Widener, 33 F. 2d 833 (C.A. 3, 1929), affirming 8 B.T.A. 651 (1927); Theodore Sabelis, 37 T.C. 1058 (1962). But this must be determined in each case by whether the taxpayer engaged in the venture with the bona fide intention of conducting it as a business with the motive and purpose of making a profit. Cf. Lamont v. Commissioner, 399 F. 2d 377 (C.A. 2, 1964); Schley v. Commissioner, 375 F. 2d 747 (C.A. 2, 1967). It is not necessary that the expectation be a reasonable one; it is sufficient if it is genuine. Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967), certiorari denied 389 U.S. 931. The intention of the taxpayer is a question of fact which we must determine upon this record. Cases of this type turn upon their own facts and no useful purpose would be served by reviewing the conclusions reached in other cases based upon the records made therein. Respondent determined that the losses sustained by petitioners from their horse raising operation are not deductible under section *275 165 because they have not established that they were carrying on a trade or business. More specifically, he contends that petitioners have not met their burden of proving that they had the requisite intent to make a profit from breeding and raising horses. To the contrary, petitioners argue that they were in the business of raising horses for profit and that the losses resulting therefrom are properly deductible under section 165(c)(1). Clearly this is not a case of a "gentleman farmer" or of "hobby" losses. Petitioners were people of relatively modest means whose principal source of income was 173 Alden's wages from the hospital and medical center which for 1963 and 1964 totaled $13,284.50 and $14,503.76, respectively. By 1963 they had acquired a total of 7 horses, and at the time of the trial herein they had 16 horses. We find it difficult to believe that a person in Alden's situation, with gross income in the respective amounts of $17,526.50 and $18,693.76 for the years 1963 and 1964, would make out-of-pocket expenditures of over $4,000 each year and do the physical labor required in the horse raising venture without having an intention to make a profit. There is nothing *276 about the physical appearance of the residence or the barn which indicates that the raising of horses was undertaken as a social diversion or for recreational purposes. Pictures of the house and barn show that both are simple, utilitarian structures having none of the frills indicative of an extravagantly maintained showplace with no concern for cost. Petitioners kept accurate and detailed records of all expenditures related to their horse-raising activities. They made every effort to keep expenses down by doing most of the work themselves. They also endeavored to conduct the operation in accordance with sound business principles, as evidenced by Alden's attendance at the Horseman's School, horse shows, Morgan Club meetings, and meetings of the New York State Horsemen's Association, and his joining the Agricultural Extension Service. These facts support petitioners' position that their horse-raising activities were a business and not a hobby. Significantly, we are concerned with the years 1963 and 1964 and the narrow question as to whether petitioners possessed the requisite profit motive during those years. The record shows that the petitioners acquired their first Morgan horse, *277 a 6-month old filly, in August 1958. By 1963, the first year in controversy, petitioners had been engaged in the horse-raising operation for only a little over 4 years. The record also shows that during 1963 and 1964 petitioners sustained losses, but "the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation." Margit Sigray Bessenyey, supra at p. 274. See also Margaret E. Amory, 22 B.T.A. 1398 (1931); and Laura M. Curtis, 28 B.T.A. 631 (1933). On brief, respondent acknowledges that petitioners could not have expected to realize a profit until they had horses of breeding age. He further acknowledges that additional losses may be incurred even after petitioners' horses reach breeding age because it takes time to establish a reputation for breeding and raising quality horses. Generally, Morgan horses cannot be bred until they are four years of age. The first of petitioners' horses was not old enough to breed until late 1962 or early 1963, and it was not until 1964 that their mares produced the first foal. *278 There is no doubt that petitioners' horse-raising venture was still in its formative stage during the years 1963 and 1964. The losses incurred during this period are not inconsistent with their declared intention to make a profit. Moreover, we are unwilling to conclude, on this record, that the prospects of achieving a profitable operation were so meager in 1963 and 1964 as to militate against a bona fide intention to make a profit. Cf. Margit Sigray Bessenyey, supra. Respondent relies heavily on the testimony of an expert witness, an experienced veterinarian, who raises horses for profit, lectures on the profitability of raising horses, and serves as a consultant on horse raising for profit. Based upon his inspection of the physical facilities of petitioners' farm as they were in 1968 and the manner in which petitioners conducted their operation in 1968, this witness testified that in his opinion the petitioners would not be able to make a profit from breeding and raising Morgan horses. From this testimony respondent urges us to infer that petitioners did not have a bona fide intention to make a profit in the years 1963 and 1964. We decline to do so under these circumstances. *279 Whether petitioners could in fact make a profit in 1968 is not the issue. Whether petitioners could in fact make a profit in 1963 or 1964 is likewise not the issue. The issue is whether petitioners in 1963 and 1964 genuinely believed they could eventually make a profit. We are persuaded, and have found as an ultimate fact, that petitioners had a bona fide profit motive during the years in issue. Whether the same expectation of profit realistically continued beyond the years 1963 and 1964 is not before us. Accordingly, we hold for the petitioners on the disputed issue. The losses sustained are therefore deductible. Decision will be entered for the petitioners. 174 Footnotes
1. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
1. Sale of one foal. ↩
2. Sale of 3 horses: One foal, $750; one 3-year old, $1,200; and one yearling, $800. During the years 1960 through 1966 the expenses of the farm were as follows:↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * ↩
3. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business.↩