Ellen R. Schley v. Commissioner.
Schley v. Commissioner
Docket No. 4459-63.
United States Tax Court
T.C. Memo 1965-111; 1965 Tax Ct. Memo LEXIS 220; 24 T.C.M. (CCH) 588; T.C.M. (RIA) 65111; April 23, 1965
George R. Sherriff, 42 Broadway, New York, N. Y., and Joseph T. Higgins, for the petitioner. Warren S. Shine and Lawrence J. Shongut, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined income tax deficiencies and additions to tax against the petitioner as follows: Addition to tax
Section 6653(a)
Section 6651(a)
Year
Deficiency
I.R.C. 1954
I.R.C. 1954
1959
$17,849.10
$ 892.46
1960
15,498.54
2,683.08
$3,415.41
1961
8,355.30
1,784.52
Certain issues raised by the pleadings have been conceded by the parties and will be given effect in the Rule 50 computation. The only issue remaining for decision is whether losses sustained by the petitioner in the operation of her farm are deductible under section 165, Internal Revenue Code *221 of 1954, as having been incurred in a trade or business operated for profit. Findings of Fact Some of the facts have been stipulated by the parties and are so found. Ellen R. Schley (hereafter called petitioner) resides at Far Hills, Somerset County, New Jersey. She filed her income tax returns for the taxable years 1959, 1960, and 1961 with the district director of internal revenue for the district of Manhattan, New York, New York. Petitioner's husband, Kenneth B. Schley, Sr., was a partner in the brokerage firm of Moore & Schley during the late 1920's. At that time business activities did not require him to spend a great deal of time in the office and Schley decided to raise Black Angus cattle. He purchased five adjoining dairy farms in Hunterdon and Somerset Counties, New Jersey, totaling approximately 660 acres. Schley set aside 10 acres for residential use. About 250 acres were put under cultivation and 350 acres were used for pastureland. The remaining acreage is woodland. On the residence site Schley built a brick house containing 25 to 30 rooms for family use and additional quarters for servants. The house is surrounded with laws and flower and vegetable gardens. *222 It was completed in 1935 and the petitioner has resided there ever since. The house and grounds have always been operated separately from the farm. The grounds are maintained by a caretaker whose salary is paid from petitioner's personal bank account. The caretaker performs no work on the farm. None of the farm's production is used at the residence, except for a portion of a heifer butchered once or twice a year and divided between the residence and farm employees. Schley began building his breeding herd in the early 1930's. He bought his original stock from Oakleigh Thorne, one of the first persons to import and breed Black Angus on the Eastern seaboard. A farm manager was employed to oversee the actual operations of the farm and to direct the work of other farm employees. Much of the produce raised on the farm is fed back to the cattle. Schley devoted himself to the development of breeding lines. This required the establishment of quality, pedigree, history and characteristics in cattle so that they could be sold for breeding rather than for consumption. Individual records were kept on the herd, including pedigrees, registrations, transfers of title and vital statistics. Periodic *223 tests were made for tuberculosis and brucellosis. Schley directly controlled the breeding herd and sought solutions to the problems he encountered from fellow breeders. Schley died on June 12, 1944. By his will, petitioner was given a life estate in the farm and residence. Since her husband had run the farm before his death, petitioner had little experience in the operation of the breeding herd. The farm manager continued to direct the actual work done, after some consultation with petitioner. Schley had been a member of the American Black-Angus Breeders Association for over 15 years. Petitioner joined the organization in January 1945, and became closely associated with other members. The breeding herd was continued until 1955 when the petitioner converted to "commercial" cattle raising in order to cut expenses. A commercial herd is one in which cattle are grown and fattened to sell for beef. Only poundage is important. A larger size herd can be maintained in the same facilities because the commercial herd requires less attention. When animals are bred for beef, registration is unnecessary since the cattle are sent to packing plants for sale. A commercial herd can be kept together. *224 Fewer man-hours are required to care for the herd, which reduces labor costs and frees personnel for other duties. A man named Field was hired by petitioner's husband as the first farm manager. Following his death in 1929, Frank Stout managed the farm until he died in 1959. Both these men were "old-fashioned" farmers who were reluctant to seek the advice and recommendations of Government agricultural representatives. Stout was not aware of many new techniques. He did not believe in receiving payments from the Government, and only consulted the county agent when in great need of help. Consequently, many of the technical assistance and relief programs offered to the farmers in petitioner's area were not used on her farm until the present manager, Robert Philbrook, assumed his duties in 1959. Philbrook has been a farmer, herdsman, and milker, and is acquainted with the breeding of cattle. In connection with his duties, Philbrook does general farm work, cares for the cattle and farm, and directs the work of the two other farm employees, Harrison Philbrook and George Hendershott. As a part of their employment, these three men have been given the occupancy of houses located on the farm. *225 Upon becoming manager, Philbrook immediately consulted the county agent and asked him to visit the farm. Philbrook also requested that he be placed on the agent's mailing list for recommendations as to crop varieties, fertilizers, and other problems. Philbrook has consulted agricultural authorities and adopted their suggestions in an attempt to make the farm more productive. In 1963, petitioner had the entire farm surveyed to determine utility, fertilizer needs, improvement of fertility, and drainage. Based on this survey, the county agent made a comprehensive report showing necessary steps which would have to be taken in order to improve general efficiency in operation. Most of these suggestions are now being followed. Considerable demand has developed near petitioner's farm for sod, which brings a price of $200 an acre. Petitioner has made efforts, through her farm manager, to negotiate sales of sod from the farm property. However, as of the end of 1964, no sod had been sold. There are several gravel deposits on petitioner's farm. These can be removed without adverse effect on the farming operation. The demand for gravel in petitioner's area has increased with the recent construction *226 of new homes in that vicinity. A survey, made by the Eastern Exploration Company, indicates that petitioner may have saleable quantities of gravel. The matter is still under consideration. From the beginning of the farm operation to the present time separate books and bank accounts for the farm have been kept. The books show receipts and expenditures, cattle purchased and sold, cost of supplies, utilities, feed, fertilizers, fuel, seeds and plants, tools, sundry purchases, threshing and bailing, veterinarian fees, Social Security tax payments; also a summary of receipts and expenditures by years, depreciation schedules, inventories, etc., hired help, insurance, real estate taxes, auto license taxes, registration of cattle, rent allowances, repairs, and sales of crops. The farm books and records were kept by Charles Meara, an employee of Moore & Schley. Meara died in 1962, and then Frederick J. Hart, a partner in Moore & Schley, took charge of the farm books and records. In January 1963, Parsons & Company, Certified Public Accountants, New Brunswick, New Jersey, took over the keeping of the books and payment of bills. The farm manager was not shown the books and records of the *227 farm and had no idea of the extent of the losses. Petitioner knew about the keeping of the separate books and records. She receives reports on the farm operation and quarterly reports from the accountants. Although elderly and now in poor health, [1] petitioner participates in some of the decisions concerning the farm and consults with the manager occasionally. The farm is not a show place but a beefcattle farm. There are no fancy board fences, elaborate stables or barns. There is no electricity in the barns. The horse stable has been converted into a cattle barn. There is only one horse on the farm for use to recapture stray cattle. The fences are at least 20 years old; some are woven wire. The barns and fences are badly in need of paint, in contrast with attractive and expensive show places in that general area. During the years in issue the State of New Jersey issued licenses for farm vehicles at reduced rates. The county agent was authorized to issue them on vehicles actually being used *228 on farms; and he visited petitioner's farm and satisfied himself that its activities met the requirements for receipt of farm vehicle licenses. The following schedule shows the gross profit, total expenses (including depreciation), and net losses sustained in the farm operation from 1935, through 1961: Gross
Total
Year
profit
expenses
Net Loss
1935
$1,766.62
$13,988.87
$12,222.25
1936
2,459.58
11,338.70
8,879.12
1937
5,649.03
13,271.17
7,622.14
1938
3,962.87
11,425.19
7,462.32
1939
5,243.12
13,068.19
7,825.07
1940
3,535.57
11,409.66
7,874.09
1941
1,689.92
10,349.59
8,659.67
1942
5,218.13
11,245.45
6,027.32
1943
6,374.15
12,647.83
6,273.68
1944
5,953.19
14,044.35
8,091.16
1945
6,799.41
12,960.97
6,161.56
1946
6,531.66
13,582.57
7,050.91
1947
7,581.21
13,522.40
5,941.19
1948
5,604.47
13,772.36
8,167.89
1949
8,253.53
13,207.86
4,954.33
1950
5,419.07
14,465.92
9,046.85
1951
6,779.85
13,526.31
6,746.46
1952
7,021.07
15,662.93
8,641.86
1953
9,422.43
19,994.42
10,571.99
1954
5,802.48
18,864.19
13,061.71
1955
3,979.93
17,375.07
13,395.14
1956
8,229.08
18,707.10
10,478.02
1957
6,003.43
18,434.98
12,431.55
1958
6,548.59
18,351.10
11,802.51
1959
6,351.78
18,151.04
11,799.26
1960
5,384.19
20,671.87
15,287.68
1961
7,491.52
22,537.90
15,046.38
*229 Petitioner has also incurred substantial losses in 1962 and 1963. Petitioner reported adjusted gross incomes, exclusive of the claimed farm losses, as follows: 1959
$93,259.91
1960
94,470.57
1961
94,446.29
Petitioner had been raised on a farm and had a strong attachment to a farming atmosphere. She continued to operate the farm after the death of her husband, notwithstanding its long history of losses, because of her love for the farm and the comfort of her life there. Petitioner did not operate, or intend to operate, the farm as a business for profit during the years 1959, 1960, and 1961. Opinion The issue here is essentially factual. Theodore Sabelis, 37 T.C. 1058 (1962). Petitioner asserts that the evidence supports an ultimate finding that during 1959, 1960, and 1961 she was engaged in the business of operating her farm for profit by raising commercial beef cattle, thus making her losses in those years deductible under section 165.[2] Respondent counters with the contention that the record shows a lack of profit motive, which of course is an important and necessary element of any trade or business. Lamont v. Commissioner, 339 F. 2d 377 *230 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court. We agree with respondent. There is no doubt that petitioner raised beef cattle and operated a farm. The evidence shows that the activities conducted by petitioner are those usually performed by one in the business of cattle raising. She employed tenants to do the manual labor required; she followed the advice of state agricultural specialists; she spent some of her own time supervising the operations; and she saw to it that adequate books and records were maintained. The farm itself was equipped with the necessary buildings and machinery. But the mere operation of a farm is not enough. To qualify as a "trade or business" within the meaning of the statute and the regulations, [3] the farm must be operated *231 for the purpose of making a profit. It is the expectation of gain that is important. The operation need not produce a profit, but it must be of such a nature that the taxpayer can reasonably expect one. Doggett v. Burnet, 65 F. 2d 191, 194 (C.A.D.C. 1933); and Henry P. White, 23 T.C. 90 (1954), affirmed per curiam 227 F. 2d 779 (C.A. 6, 1955). In other words, were the petitioner's farming and cattle raising activities "engendered by the motive or intent of realizing profits"? Lamont v. Commissioner, supra.We think not. We have carefully considered several pertinent facts in reaching this conclusion. First, as we have previously pointed out, the petitioner was unable to testify in her own behalf because she has been quite ill and *232 under a doctor's care since about 1955. Consequently, it was necessary for us to determine her purpose and motive in operating the farm from the testimony of her witnesses, particularly her son, Kenneth, Frederick J. Hart and Robert E. Philbrook. None of them were able to supply facts establishing even a minimal profit-oriented intention. Kenneth, when asked why his mother continued to operate the farm after her husband's death in 1944, replied: "I'm sure the main reason that she continued the operation of the farm was her own love of the farm itself and her desire to take it on and do the best she could with it * * *." Hart, who was petitioner's close friend and her business and investment adviser, was asked: "Do you known why she was operating the farm?" He replied: "Well, she loved farming; that I know." And when Philbrook, the farm manager since 1959, was asked the same question on direct examination, he answered: "I think she enjoys farmers. That's the reason she operates it." At least we know that she did not operate the farm for her livelihood since her income from investments alone averaged over $90,000 per year. Petitioner has lived for many years in a gracious country home *233 surrounded by the atmosphere that she has always known and loved. Her husband had used the farm to breed cattle of which he was especially fond. Their son was raised there. Petitioner's substantial income from other sources permitted her to continue this way of life, after her husband's death, without the slightest financial worry about the losses the farm might incur. An insight into the pleasure she derived from the farm as compared with any alleged profit motivation was revealed by the testimony of Kenneth when he was asked during direct examination whether at the present time his mother was anxious to pursue the possibility of selling some gravel for cash to a company possibly interested in acquiring it. He replied: "If she can pursue it with the idea of getting a socalled cash crop in without it ruining her property in any way, well, they want to go ahead with it." In other words, petitioner would have been willing to increase the farm income only if it did not spoil or interfere with her enjoyment of the property in any way. This attitude was further substantiated by the testimony of her investment adviser, Hart, that through the years his few conversations with her regarding *234 the farm losses were always "casual," apparently out of his realization that a profit was a matter of indifference to the petitioner. These indications by her own witnesses as to petitioner's motivation and purpose in operating the farm paint exactly the same picture we view from our consideration of the objective evidence. We see (1) a 28-year history of losses which have increased significantly in recent years, Morton v. Commissioner, 174 F. 2d 302 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court, and Henry P. White, supra; (2) annual gross profits from the farm remaining relatively static in recent years, while at the same time expenses have increased steadily; (3) the unexplained retention of and reliance on a farm manager, Stout, who for some 30 years did nothing to improve efficiency or participate in specific Government programs designed to improve operations; (4) petitioner's failure to consult with the managers, past and present, on the extent of the losses; and (5) a farm suffering from numerous deficiencies, inefficiency and obvious indifference to profit-making in its overall operation and management. Thus, despite the arguments advanced *235 by petitioner's able counsel, we are unable to draw the inference from the evidence adduced that petitioner, both before and during the years in controversy, had any reasonable expectation that the farm operation would ever realize a profit. The evidence leads us to the contrary conclusion. A "genuine profit motive," which in our judgment is the most important criterion for finding that a given course of action constitutes a trade or business, is simply missing here. Henry, P. White, supra; and Lamont v. Commissioner, supra.Accordingly, we hold for the respondent. In view of the disposition of other stipulated issues. Decision will be entered under Rule 50. Footnotes
1. Petitioner was physically unable to give her testimony at the trial or by deposition because she suffers from diabetes and arteriosclerosis and had fractured a vertebra of the spine.↩
2. SEC. 165 [I.R.C., 1954]. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; * * *↩
3. Sec. 1.165-6(a)(2), Income Tax Regs.
(2) If the taxpayer owns and operates a farm for profit in addition to being engaged in another trade or business, but sustains a loss from the operation of the farming business, then the amount of loss sustained in the operation of the farm may be deducted from gross income, if any, from all other sources. [Emphasis supplied.]↩