TEMPEL SMITH and ESTHER V. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; TEMPEL STEEL COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket Nos. 1435-74, 1436-74.
United States Tax Court
T.C. Memo 1979-324; 1979 Tax Ct. Memo LEXIS 205; 38 T.C.M. (CCH) 1246; T.C.M. (RIA) 79324; August 20, 1979, Filed Howard G. Krane,Raymond P. Wexler,Darwin P. Bromley, and George B. Javaras, for the petitioners. Edward G. Lavery, for the respondent. *206 FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income tax, as follows: Dkt No.
Petitioners
Year
Amount
1435-74
Tempel and
1967
$132,353.48
Esther v. Smith
1968
$176,456.16
1439-74
Tempel Steel Co.
1965 [1]
$89,943.00
1967
$32,883.00
These cases have been consolidated for purposes of trial, briefing, and opinion. The issues for consideration are: 1. Whether certain expenditures incurred by petitioner Tempel Steel Company in developing a Lipizzan entertainment attraction and sales operation are deductible under section 162(a)[2] and section 167(a); 2. Whether certain expenses incurred by petitioner Tempel Steel Company in breeding and selling Haflinger and Anglo-Arabian horses are deductible under section 162(a) and section 167(a); and 3. If the expenses described in 1 and 2 above are not properly deductible by petitioner Tempel Steel Company, whether such expenditures *207 were incurred for the personal benefit of its owner, petitioner Tempel Smith, so as to be includible in his gross income under section 301 and section 61. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Tempel and Esther V. Smith, husband and wife, resided in Lincolnwood, Ill., at the time they filed their petition in this case. Petitioner Tempel Steel Company is an Illinois corporation organized in 1947. At the time its petition herein was filed, the corporation's principal place of business was located in Chicago, Ill. Petitioner Tempel Smith (hereinafter "Smith") was born in 1909. After completing only one-year of high school, Smith left and for a while thereafter held a variety of jobs. In 1930 he was employed by Webster Electric Company which manufactured various products including steel laminations. Over the next 15 years Smith worked for Webster as a sheet metal man, foreman, and finally as superintendent of Webster's entire plant. In 1945 he left that company to begin his own business of manufacturing steel *208 laminations. Two years later in 1947, petitioner Tempel Steel Company (hereinafter "Company") was organized to run the manufacturing business. Since 1955 Company has had one class of outstanding common stock over 90 percent of which has been owned directly by Smith or his wife. Over the years, Company's steel lamination business has grown from net sales in 1957 of a little over $9 million to net sales in 1977 of about $140 million. The Lipizzan Issue.
In 1957 Smith and some business associates traveled to Germany to attend the Hanover Machine Tool Show. After spending a week in Germany, they traveled to Vienna, Austria, for the purpose of seeing a Lipizzan performance and visiting the stables of the Spanish Riding School. The breed of horses known as Lipizzans originated in Imperial Austria in the late 16th century when the Austrian monarch brought a breed of horses to the village of Lipizza (now part of modern Yugoslavia). Since then, the Austrian government has bred and trained Lipizzans and created and developed the Spanish Riding School in Vienna where performing Lipizzans have been shown since the middle of the 18th century. A Spanish Riding School Lipizzan *209 performance consists of six separate acts and is about one and one-half hours in length. Only the highest quality stallions can be trained for performances. The show begins with a performance by young stallions in the first stages of training and then proceeds with more accomplished horses performing airs above the ground, steps and movements of the classical school, pas de deux, and work in hand and on the short hand rein. The highlight of a Spanish Riding School Lipizzan performance is the school quardrille, involving the performance by eight stallions in concert. Prior to viewing the Spanish Riding School performance in 1957, Smith had known very little about Lipizzan horses and had no thoughts of purchasing any such horses. While watching the show, however, Smith was so impressed by the beauty and precision of the performance, the spellbound audience, and the popularity of the attraction, that afterwards he met with an official of the Spanish Riding School and inquired as to the Lipizzans. He was told that none were available in Vienna. Disappointed with this response, the following day Smith traveled by car to the Austrian Government Breeding Station in Piber, Austria, *210 where he was told that some Lipizzans were available for purchase. Shortly thereafter, in October 1957, Company purchased some Lipizzan horses. The purchased horses were kept in Austria for a while and in 1958, 6 stallions and 15 mares were delivered to Company in the United States. They were initially kept at a rented farm but in 1959 Company made the first of its land purchases and the horses were moved to their permanent home in Lake County, Ill. Over the years, Company has continued to add land to its farm division, and presently owns about 5600 essentially contiguous acres in Lake County. This land cost approximately $25 million and in 1977 had an appraised value of $40 million. [3]
From 1958 to 1963, the herd grew from 21 to 44, and by 1963 Company fully committed itself to developing a replica of the Spanish Riding School in the United States. To this end, Company in 1963 retained Willi Schultheis ("Schultheis"), a renowned horse expert, as a consultant. Schultheis *211 is a German citizen currently residing in Warendorf, Germany. He was born in 1922 in Germany and at the age of 14 began an apprenticeship in dressage riding under German riding master Otto Loerke at the German Cavalry School in Hanover, Germany. Schultheis has been a professional dressage rider in European competitions since 1949 and was national dressage champion of Germany for 13 consecutive years. He has been a trainer and coach at every Olympic competition since 1952 and, in 1974, became the coach of the German Olympic dressage team. Following the 1976 Olympics in Montreal, Canada, the Belgium government retained Schultheis to train and develop the Belgium dressage team for the 1980 Olympics. In 1978 he agreed to conduct a clinic in Moscow for the Russian dressage team. When he was first retained in 1963, Schultheis was told by Smith that he wanted to develop a Lipizzan entertainment attraction similar to that of the Spanish Riding School. With this in mind Schultheis in 1964 advised Company that its trainers were not qualified to properly train the Lipizzans and, at Company's request, agreed to try to locate qualified trainers. Subsequently, Schultheis in 1965 introduced *212 and recommended to Company Adolph Athenstaedt ("Athenstaedt"), a former student of his and a qualified Lipizzan trainer. Company thereupon hired Athenstaedt, and since 1966 he has been totally in charge of Company's Lipizzan training program. Athenstaedt was born in 1938 in Hamburg, Germany. At age eighteen, he became an apprentice rider under Schultheis. Athenstaedt worked under Schultheis until early 1965, when Athenstaedt went to Vienna, Austria, to begin training several horses which Company had purchased and left in Vienna for training. While in Vienna, Athenstaedt worked with Johann Irbinger, chief rider of the Spanish Riding School. Also in 1963, Company hired Dr. Mikulas Ferjencik ("Ferjencik"), an expert in horse breeding and veterinary medicine. Ferjencik received his degree in veterinary medicine from University Marysik, Brno, Czechoslovakia, in 1927 and then entered the Czechoslovakian army. In 1939 Ferjencik was promoted to head veterinarian of the Slovak army, with all its breeding stock, including some 75,000 horses, under his command. Following World War II, Ferjencik became a two-star general in the Czechoslovakian army and later Undersecretary of Defense of *213 Czechoslovakia. In 1949 he left Czechoslovakia and came to the United States following the Communist take-over of Czechoslovakia. From 1950 through 1962 he was head veterinarian and manager of the Denemark Stables in Hinsdale, Ill. Ferjencik's instructions were to breed Company's Lipizzan herd to the size and quality required to support a Lipizzan entertainment attraction. Since 1963, Ferjencik has been totally in charge of Company's Lipizzan breeding program, including responsibility for the actual breeding of Company's Lipizzans, the health and general condition of Company's Lipizzans, and the maintenance of all breeding records, which are detailed and complete. These records include: 1. Ledgers indicating each instance of the mating of two horses; 2. Ledgers indicating the name, birthdate, sire, and dam of each horse purchased by or born at Tempel Farms; and 3. Pedigree records indicating the ancestry of each purchased horse, to which each horse born at the Company may be traced. Schultheis and Ferjencik advised Company in 1963 that it would take at least 15-20 years for Company to develop fully a Lipizzan riding show operation. This is a function of both the *214 size of the breeding herd and limitations on the ability to train stallions. In order to present professional Lipizzan performances on a regular basis Company needs a training herd of between 35 and 40 high quality Lipizzan stallions of which 18-20 must be fully trained. Company's planned performances require 12 fully trained horses in addition to the five to six young stallions used in the opening act. A fully trained stallion cannot perform in two or more performances a week regularly because of the strain of the performance and the necessity for continual re-training. Thus, in order to put on regular performances involving 12 horses a minimum of 18 fully trained horses is required, and to maintain a fully trained complement of 18 horses, a training herd of an additional 15 to 20 stallions is also required. Once a full complement of trained and partially trained stallions is achieved, age, injuries and retirements require the addition of three new stallions each year into the performance-training program. The procedure for developing additional trained stallions may be briefly described as follows: Because of the horses' maturation process, the decision of whether a stallion *215 will be qualified for training cannot be made until the horse is about four years old. Of the stallions selected at about age four for training, not all turn out to have the qualities necessary for training and showing, and only the best are fully trained for shows. In order to maintain a full complement of trained and partially trained stallions and to provide three to six performance-trainable stallions annually, a breeding herd of about 215 Lipizzans is necessary. This herd would have 50 brood mares which will generate each year about 40 foals, half of which, on the average, should be colts. Of these approximately 20 colts born each year 15 will be deemed qualified to commence training and of those 15 approximately three to six will have the qualities necessary to be trained for actual performances. Once the breeding and training programs are fully coordinated, there will be about 40 horses per year available for sale, at prices estimated to be at least $3,000 per horse, and probably more. In 1963, Company had a Lipizzan herd of about 65 horses. Through selective breeding, Company finally achieved, in 1975, the quality of brood mares and stallions necessary to produce *216 enough high quality stallions each year for the training program. In 1975 the total number in the Lipizzan herd was close to 350 and at the time of trial about 400, or almost 200 horses which are not needed by Company either for purposes of breeding or training. Ferjencik, Company's breeder, and Smith decided in 1975 to postpone sales of Lipizzans to the public until after Company begins presenting Lipizzan performances on a regular basis. This decision was based on their judgment that the way to develop the sales market was to educate the public through regular Lipizzan performances and not to start selling horses prematurely before regular performances commenced. At the time of the trial of this case, Company's herd of Lipizzans was the largest in the world. Following is a chart showing the growth of Company's Lipizzan herd from 1958 through 1977: Births/
Dec. 31 Year
Acquisitions
Dispositions
Total
1958
21
0
21
1959
6
0
27
1960
5 0
32
1961
7
0
39
1962
5
0
44
1963
21
0
65
1964
19
0
84
1965
26
0
110
1966
27
0
137
1967
21
3
155 1968
25
3
177
1969
28
6
199
1970
35
21
213
1971
30
13
230
1972
40
15
255
1973
41
18
278
1974
51
17
312
1975
38
9
341
1976
41
8
374
1977
40
15
399
Totals
527
128
*217 Company's training program has almost, but not quite, kept pace with its breeding program. Thus, in 1963, Company had seven horses in training of which none were fully trained. In 1975, Company had 27 horses in training of which 16 were fully trained, and at the time of trial Company had 31 horses in training of which 15 were fully trained. Company is still short of having the requisite number of fully and partially trained stallions for two reasons. First, it was not until 1975 that the breeding program started producing the necessary number of stallions. Second, qualified trainers can only work with five Lipizzan stallions at a given time. Company currently employs four rider trainers (including Athenstaedt) and one apprentice. Company has made extensive efforts to hire additional qualified trainers. Such efforts have included advertising in domestic and foreign trade magazines, working with a German employment agency and trips to Europe by Athenstaedt in search of trainers. The following chart shows the total number of Lipizzan stallions in the training program each year since 1960, and the number of those which were fully trained to perform: Total Number Trained
Total Number Year
or In Training
Fully Trained
1960
6
0
1961
6
0
1962
5
0
1963
7
0
1964
11
0
1965
15
0
1966
15
0
1967
16
3
1968
16
6
1969
22
9
1970
23
11
1971
23
11
1972
23
13
1973
25
13
1974
26
16
1975
27
16
1976
26
17
1977
31
15
*218 By 1966, Company had enough partially trained horses to commence publicizing its Lipizzans through public appearances. As the number of fully and partially trained horses grew, the number of appearances increased. Thus, Company's Lipizzans made their first significant appearance in 1966, and since have made two in 1967, three in 1972, and in 1973 appeared in the Presidential Inauguration and made four other significant appearances as well. Company continued to make appearances in 1974 (five), 1975 (eight) and 1976 (four). In 1977 the horses appeared again at the Inaugural Parade and in the fall of 1977, they appeared for a fee at the Washington International Horse Show before over 8,000 people and at the National Horse Show in New York City. Company's Lipizzan training sessions in Lake County, Ill., are also open to the public on Wednesday and Friday mornings. An effort to exhibit Company's Lipizzans in Europe in 1973 was thwarted by a threatened boycott of European horse shows by the Spanish Riding School of Vienna. By the early 1970's, Company's program was well enough along to retain various professional architects for the purpose of preparing preliminary sketches and *219 renderings of a facility for Lipizzan performances. After consulting several architects and reviewing various alternative plans, Company engaged Edward Dudley, architectural designer, Chicago, Ill., to design the facility. In the fall of 1974, construction was begun on the facility hereafter referred to as the Temporary Performing Arena. The site selected was adjacent to Company's outdoor training and showing arena and in close proximity to the stables used for the training herd. The Temporary Performing Arena was completed by Thanksgiving 1974, and is used for training performances. Although the interior has not been completed, the structure was designed to provide space for the installation of seating for performances. In Spring, 1976, Company connected its training stables with the Temporary Performing Arena by means of a covered breezeway. In 1974 Company hired Economics Research Associates (ERA), a consulting firm specializing in market and financial feasibility studies for recreation and entertainment facilities, to prepare a report refining Company's plans to present Lipizzan performances on a continuous attraction basis and projecting attendance and variable expenses *220 from such performances. A final report dated April 1, 1977, was prepared by ERA under the supervision of ERA's President, Wayne Wilson, an expert on the economic feasibility of recreation areas and vacation facilities. [4]
The ERA report concluded that the projected yearly attendance potential of Company's Lipizzan shows for the beginning years of regular performances would be between 139,000 and 185,000 persons and that yearly attendance could be expected to increase as Company's Lipizzan attraction becomes established and penetration of secondary markets is accomplished. These attendance figures are based on a regular weekly schedule (three to five performances per week) over a 40 to 50 week season. Any attempt to commence performances on an irregular basis (i.e. three shows every two weeks) would create consumer confusion and would be uneconomic.
The projected yearly attendance was based on ticket charges of $5.00 per seat, less a 5 percent discount for group sales. After adding in concession revenues of 60 cents *221 per person, and sales of 25 horses per year at $3,000 apiece, ERA subtracted operating expenses to arrive at projected net operating income for the initial years of performances of $51,380 per year. This projected net income is expected to increase as the Lipizzan program gains recognition with a corresponding increase in attendance. The expenses used in arriving at the initial income figure included $12,340 of real estate taxes on land, but did not include any depreciation. Purther, projected horse-related expenses of approximately $500,000 were based upon a heard of 325-350 Lipizzans, which is about 130 horses more than will eventually be needed. Company's accounting department prepared pro forma financial statements projecting Company's income and expense from its initial operations. This projection changed the assumptions of the ERA report by projecting more seating so that 120 shows per year would draw 140,000 people at an average ticket price of $5, less a 5 percent discount for group sales. Beverage sales were set at 60 cents per person, other concession sales at $1 per person, and 40 horse sales per year were anticipated at $3,000 apiece. Variable costs of producing *222 the show were based upon the per-show costs developed by ERA, while horse-related expenses were based on a heard of 200-215 Lipizzans. Annual depreciation of $66,000 was projected on buildings and other land improvements, and $9,000 of real estate tax on land was included in expenses. On these bases, annual net operating income for the initial years was projected to be between $52,500 and $261,000. As of February 1, 1978, Company's farm division had 43 full-time employees: three for administration, 17 for horse breeding purposes, 13 for Lipizzan training purposes (including trainers and others), 4 for agricultural activites, 3 for security and 3 for repair and maintenance. In 1967 and 1968 Company farm division employed 32 and 33 persons, respectively. As the horse operation progressed, more detailed accounting records were required. Before 1967, Company maintained separate profit and loss statements for its farm division. Commencing in 1967, Company began supplying management with additional accounting information, including profit and loss statements, on a departmental basis, with the horse division separately stated. Thereafter, in 1975, Company adopted the enterprise *223 method of accounting for its horse division, separately stating income and expenses of different breeds and, within each breed, separately stating training and breeding expenses. The following chart shows the financial results of Company's overall farm operations in accordance with Company's books and records for the years 1958-1966: Year
Net Farm Loss
1958
$ 48,122
1959
76,235
1960
82,812
1961
120,209
1962
196,443
1963
196,704
1964
315,977
1965
341,268
1966
351,515
Total
[1] $1,729,285
The following chart shows the financial results of Company's farm operations in accordance with Company's books and records for the years 1967-1976: Net Loss
Net Loss
Undistributed
Total
Allocated to
Allocated to
Farm
Farm Year
Horse
Other Farm
Expense
Loss [2]
Operations [1]
Operations
1967
$187,774
$56,200
$98,773
$ 342,747
1968
243,432
38,183
111,826
393,441
1969
325,249
73,194
161,660
560,103
1970
324,891 70,697
212,686
608,274
1971
309,513
73,226
222,741
605,480
1972
333,954
41,792
271,982
647,728
1973
413,549 82,399
271,465
767,413
1974
435,372
130,099
389,882
955,353
1975
714,801
(41,733)
[3]
1,192,568
1976
860,828
3,525
[3]
1,348,017
Totals
$4,149,363
$527,582
$7,421,124
*224 The Haflinger and Anglo-Arabian Issue.
While Smith was touring the Austrian Government Breeding Station in 1957 he discovered the existence of another breed of horses known as Haflingers. Although he had never seen a Haflinger before, he inquired whether they were also for sale and was told that they were. In 1958 Company acquired 13 Haflinger horses in Tyrol, Austria, and brought them to the United States and began a program of breeding and selling the horses. Haflingers are an Austrian breed of small horses used as pack horses in mountain areas. They have limited usefulness since they are not riding horses, but they can be used as pulling horses. The expenses incurred by Company in *225 1967 and 1968 with respect to its Haflinger activity were $40,006 and $57,403, respectively. In 1963 Company put Ferjencik in charge of the Haflinger breeding and sales program instructing him to build up the Haflinger herd to the size and quality required for Company to develop a market for the Haflingers in the United States. Ferjencik advised Smith in 1963 that it would take six or seven years of breeding to increase the quality and quantity of Company's Haflinger herd before Company would be in a position to begin a successful Haflinger sales program. By 1970 Ferjencik had built up Company's Haflinger herd and since then Company has been advertising and selling Haflingers. Company's Haflinger asking prices currently range from about $750 for weanlings to $1,500 to $2,000 for older Haflingers. In about 1972 Company concluded that it was not making enough money from the prices being charged for Haflingers. Thus, in 1973 Company increased its prices for Haflingers by 50 percent but found out over the next several years that it was unable to sell sufficient horses at these higher prices. Recently Company lowered its Haflinger prices and Company's present intention is to *226 dispose of its entire Haflinger herd because Company now believes that it cannot sell its Haflingers at prices which would make the Haflinger activity a financial success. The following schedule sets forth the history of Company's Haflinger herd from 1958 through 1977: Dec. 31
Sales Year
Total
Number
Proceeds
1958
13
0
0
1959
17
0
0
1960
22
0
0
1961
25
0
0
1962
28
0
0
1963
35
0
0
1964
44
0
0
1965
55
0
0
1966
63
0
0
1967
77
0
0
1968
95
0
0
1969
112
0
0
1970
117
13
$ 11,250
1971
97
29
22,800
1972
100
16
13,050
1973
102
16
10,400
1974
123
9
9,000
1975
132
7
6,250
1976
148
8
8,050
1977
143
40
43,550
In 1964 Company acquired seven or eight horses of one breed in Babolna, Hungary, and began cross-breeding them with another breed.At least one of the two breeds was based upon Arabian bloodlines. The offspring were referred to as Anglo-Arabians.The herd grew in size, numbering 27 at the end of 1967 and 31 at the end of 1968. In 1970 Company determined that it could not get the expected prices for the horses, and, therefore discontinued the breeding and selling of Anglo-Arabian *227 horses and sold its entire herd. Constructive Dividend Issue. Smith and his wife do not reside on or adjacent to Company's Lake County farm land. Smith does not ride Company's horses, and neither he nor his wife have ever owned a riding horse. No one else in his family rides, except for his two daughters, who have ridden occasionally. Smith does not personally participate in Company's breeding or training activities. Although Smith's personal friends have viewed Lipizzan performances, Company has not produced Lipizzan horse shows solely for their entertainment. Company owns all of the property of the farm division including all the horses, and all of the division's employees are Company's employees. All correspondence relating to Company's activities is carried on stationery bearing the name of "Tempel Steel Company" or "Tempel Steel Company, Tempel Farms Division." Trucks assigned by Company to its horse activities bear the name of Tempel Farms. Newspapers, magazines, and other media are always informed that Tempel Farms is a division of Tempel Steel Company and letters of complaint and correction are sent to newspapers and magazines when they refer to the Lipizzan *228 as belonging to Smith or as being his personal hobby. In his statutory notice of deficiency, respondent disallowed Company's net losses on its horse operations for 1967 and 1968, plus certain other expenses recorded on the books of the steel products division in the amounts of $10,482 and $5,880, respectively. He also determined that the disallowed amounts constituted dividend income to Smith for his taxable years 1967 and 1968. Company's retained earnings and profits at the end of 1967 and 1968 exceeded the amount of dividend income determined by respondent for such year. Company has never declared and paid a formal dividend to its shareholders.
OPINION At issue is the question whether petitioner Tempel Steel Company ("Company") may deduct certain expenses it incurred in connection with the operation of various horse activities. Respondent disallowed these deductions based on his belief that the expenses were not incurred in the pursuit of a trade or business of Company. In addition, respondent determined that the disallowed expenses, to the extent they exceeded income, constituted dividend income to petitioner Tempel Smith ("Smith") under section 301 and section 61. Therefore, *229 the primary issue for our consideration is whether the horse activities conducted by Company during the years in question rose to the level of a trade or business as that term is used in appropriate sections of the Code. [5]
It has long been held that breeding, racing, showing, and raising horses for sale, may constitute a trade or business. Commissioner v. Widener,33 F.2d 833 (3d Cir. 1929), affg. *230 8 B.T.A. 651 (1927); Wilson v. Eisner,282 F. 38 (2d Cir. 1922). However, whether such activity constitutes a trade or business in the particular circumstances of each case is determined by whether the taxpayer engaged in the venture with the intention to operate for the purpose of making a profit. Schley v. Commissioner,375 F.2d 747 (2d Cir. 1967), affg. a Memorandum Opinion of this Court; Lamont v. Commissioner,339 F.2d 377 (2d Cir. 1964), affg. a Memorandum Opinion of this Court. The expectation of making a profit may not be a reasonable one, but the taxpayer must show that the expectation was in fact genuine. Bessenyey v. Commissioner,45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). The issue presented is one of fact and the burden of proof rests with petitioners. Sabelis v. Commissioner,37 T.C. 1058 (1962). After closely reviewing all the facts and circumstances in the matter before us, we hold that petitioners *231 have met this burden. Company possessed the requisite genuine expectation of realizing a profit from its horse operations and was therefore engaged in the trade or business of raising and breeding horses for showing and for sale.
The Lipizzan Issue.
Since 1947 Company has been successful in the operation of its business of manufacturing steel laminations. In 1957 Company's founder and principal shareholder, Smith, traveled to Europe on business. While in Europe, Smith visited Vienna, Austria, where he viewed a performance of the Spanish Riding School and its Lipizzan stallions.The School is a widely-known cultural attraction which has been performing on the same site for approximately 200 years. Stirred by the beauty and precision of this performance, Smith made inquiries as to the availability for purchase of Lipizzan horses. After Smith located some available Lipizzans, Company undertook to purchase 21 of such horses, which were delivered to the United States in 1958. Since then, Company's herd of Lipizzans has grown from 155 and 177 horses in 1967 and 1968, respectively, to 399 horses in 1977.
In each of the years since 1958, Company's expenses with respect to its Lipizzan *232 horses have exceeded its income from the horse operations. Respondent's position is that during the years before us the net losses sustained by Company in connection with its Lipizzan horse activities were to further personal, nonbusiness purposes of Smith. He argues that without any bona fide expectation of making a profit on their showing or sale, Company undertook to acquire the Lipizzans simply because Smith desired it. Thus, respondent concludes, Company was not in the trade or business of breeding and raising horses and, as a consequence, any expenses related thereto are not deductible. To the contrary, Company's position is that Smith's reason for having Company purchase the horses was to establish a replica of the Spanish Riding School in the United States on a commercial basis. Company asserts that from their inception, the horse operations have been conducted with a profit motive and in a manner wholly consistent with that motive. Considering all the events surrounding Company's initial purchase of Lipizzans, we think Smith's motives at the time were both personal and business related. At the trial of this case, Smith testified that his principal reason for having *233 Company purchase the Lipizzans in the first place was to be able to exploit them commercially through the staging of performances similar to those of the Spanish Riding School. He stated that he agonized over the decision and that the people in Austria with whom he spoke about his intentions stressed the great difficulty in doing so. His sense of business intuition, however, led him to conclude that the challenge of replicating the Spanish Riding School in the United States was an opportunity similar to the one he already successfully mastered in steel laminations. While on balance we found Smith's testimony to be candid and forthright, and while we are convinced he honestly believed he could realize a profit from the Lipizzans, we nevertheless find it difficult to believe Smith's motives were purely profit or commercially oriented. Prior to viewing the Spanish Riding School's performance, Smith had known very little about Lipizzans and had even less intention of purchasing any. Yet, with little or no forethought of their economic feasibility as a cultural or sports attraction, Smith had Company undertake to purchase 21 Lipizzan horses. Under these circumstances, we think Company's *234 initial acquisition, at least in part, was made to satisfy a purely personal desire of Smith. However, we need not decide which motive--business, as Company contends, or personal, as respondent contends--was paramount in the decision to initially acquire the Lipizzans because by 1963, and continuing throughout the years in issue, we think it clear that Company's raising and breeding operations were predominantly business-oriented. Specifically, since 1963 the activities were conducted with the objective of developing a commercial entertainment attraction featuring Lipizzan performances, which would generate profits through ticket sales and create a sales market for Lipizzan horses not needed for the performances or the breeding herd. In reaching our conclusion that Company's horse activities constituted a trade or business, we have relied on several factors. First of all, we are impressed with the efforts Company has made to secure highly qualified personnel to run its operations. In 1963 Company retained Willi Schultheis, a renowned horse expert, as a consultant. Schultheis was hired to advise Company on the feasibility of its objective and to assist it in its implementation. *235 When Schultheis advised Company that its objective was obtainable, he was then commissioned to find a qualified trainer to supervise the training. Subsequently, Company on Schultheis' recommendation hired an expert head trainer, Adolph Athenstaedt, who has in turn recruited other trainers since. As its expert on the breeding of horses, Company hired Dr. Ferjencik, an individual with outstanding credentials. Further, as the herd increased, additional staff was hired, growing to 43 full-time employees in 1978. The objective to breed and develop sufficient trained horses for regular, commercial Lipizzan performances was communicated to everyone involved, and the development has continued unabated--from a herd of 44 in 1963 to 400 in 1977, and from no fully trained horses capable of performing in 1963 to 15 fully trained horses in 1977. Secondly, the fact that Company maintains detailed breeding and financial records is also a strong indication of the presence of a profit-making motive. As the horse operation progressed, more detailed accounting records were required. Before 1967, Company maintained separate profit and loss statements for its farm division. Commencing in 1967, *236 Company began supplying management with additional accounting information, including profit and loss statements, on a departmental basis, with the horse division separately stated. Thereafter, in 1975, Company adopted the enterprise method of accounting for its horse division, separately stating income and expenses of different breeds and, within each breed, separately stating training and breeding expenses. With respect to the breeding activities, Ferjencik has kept records showing each instance of the mating of two horses; the name, birthdate, sire, and dam of each horse purchased or born at Tempel Farms; and the pedigree records indicating the ancestry of each purchased horse. Such records were necessary to the Company's objective because only the highest quality Lipizzan stallion can be trained for performances, and the quality of the stallion is directly related to its heritage. Third, the immense scale of Company's horse operations are such that it would supply many times over the merely personal satisfaction Smith would derive from owning and raising fine horses. Consisting of nearly 400 horses, Company's herd of Lipizzans is the largest of its kind in the world. It *237 is stabled on a farm which consists of 5600 acres apparently worth an amount well in excess $25of million. Since Smith has little control over the daily care of the herd, we think any pleasure that may accompany managing a herd of such size and involving so considerable a financial commitment must be only the satisfaction one derives from operating a business. Another indication that Company's venture was intended as a business was the thoroughly professional mode of its operation. [6] The hiring of highly qualified personnel, the maintenance of meticulous records, the careful attention paid to breeding, the construction of an entertainment facility, the retention of an expert consulting firm to analyze market conditions, the fact that the horses are always shown and held out as a division of Company, are all factors which combine to demonstrate that Compny's intentions were commercially oriented. *238 Moreover, there is little or no evidence that Smith or his family used the horses for recreational purposes or as a social diversion. Smith does not reside on Company's horse farm. Neither he nor his family are personally involved in any of Company's breeding or training operations. Company does not produce or hold Lipizzan performances for Smith's friends. Smith has never personally ridden any of the horses, and, in 20 years, Smith's two daughters have only ridden the horses occasionally. Respondent argues that Company had no profit-making intention based on the fact that since 1958 the horse operations have experienced an uninterrupted series of loss years.We are mindful that a history of losses over a period may be an important factor bearing on a taxpayer's true intentions; however, in the circumstances of the instant case, we think the losses sustained are reflective of the business realities of the Lipizzan enterprise and are not indicative of a lack of intent to make a profit. In 1963 Company began devoting all of its efforts with respect to its Lipizzans towards the development of a commercial Lipizzan entertainment attraction for presentation to paying audiences *239 on a regular basis. The record demonstrates that it would take between 15 and 20 years to develop and present such an attraction on a regular basis. This is so for the following reasons: Each Lipizzan performance which Company plans to put on requires 12 fully trained horses. In order to put on two or three performances a week, a minimum of 18 fully trained stallions is required because of the physical strain a performance puts on a horse, and because of the need to re-train continually even a fully trained horse. Moreover, in order to have a constant supply of 18 to 20 fully trained stallions, an additional training herd of 15 to 20 is necessary. To supply enough stallions a minimum herd of 215 Lipizzans, of which 50 are brood mares, is necessary. By 1975 Company had developed the herd to the required size, but even at the time of trial was still short of enough fully trained horses. The record shows that there was no economically viable shortcut for the Company. Schultheis testified that if Company had started full, regular programs without enough trained horses, the operation would collapse within a short period of time due to the lack of sufficient replacements. The economic *240 expert testified that if Company commenced putting on commercial performances on an irregular or abbreviated schedule, it would have created consumer confusion and would have been enormously uneconomical. In short, premature commencement of commercial performances would have been counter-productive to Company's economic objectives. Thus, Company's loss history merely reflects the result of a profit-motive business decision based on expert advice, and is not indicative of any lack of intent to realize profit. Briefly put, Company embarked upon a unique venture. Whether the economic rewards will be sufficient to justify its efforts remains to be seen. In any case, the steps Company has taken over the years with respect to its Lipizzans have all been consistent with its goal of bringing a commercial Lipizzan entertainment attraction to market.We therefore conclude Company is entitled to a deduction for the expenses it incurred in developing a Lipizzan entertainment attraction and sales operation. The Haflinger and Anglo-Arabian Issue.
Both of these breeds were imported into the United States by Company for the purpose of breeding them for sale. Company's activity with *241 respect to both breeds establishes a clear intent to make a profit. Thus, Company endeavored to develop a profitable sales program with respect to each breed, and when it became clear profits were not likely, Company discontinued the program. With respect to the Haflingers, Company engaged in extensive efforts to sell and at various times tried to increase the price to make the program profitable. The price increase did not take, and the program has proved unprofitable. As a consequence, Company had decided to discontinue the breeding program and liquidate the herd. This history--development, sales activity and discontinuation when profits are not foreseeable--clearly demonstrates a profit-intended business enterprise. Similarly with the Anglo-Arabians: There were attempts to develop the breed for sale; neither the breeding nor the sales activity got off the ground because no discernable market ever developed; and, in 1970, Company liquidated the entire herd. Based on the entire record, we conclude that Company's activities associated with its breeding and raising Haflinger and Anglo-Arabian horses were conducted with a profit motive. The cessation of those activities is not *242 inconsistent with that motive. Accordingly, we hold Company is entitled to a deduction for the expenses it incurred in connection with the breeding, raising, and selling of Haflinger and Anglo-Arabian horses. Constructive Dividend Issue.
Because we have found that Company's horse operations were conducted as its trade or business, respondent's determination that the expenses incurred therewith are constructive dividends to Smith is hereby rejected. To reflect the foregoing, Decisions will be entered for the petitioners.
Footnotes
1. The year 1965 is in issue because the disputed adjustment, which involves the tax years 1967 and 1968, reduces the net operating loss carryback deduction available for 1965.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
3. In addition to the activities related to its horse operations, Company's farm division has been engaged in growing, using, and selling various crops such as corn, hay, oats, wheat, and soybeans.↩
4. Economic Research Associates has done market research for Disney World, Busch Gardens, Six Flags Amusement Park, Sea World, and Great American Theme Park.↩
1. No real estate taxes are included in the 1958-1966 losses except for $17,053 in 1964 and $48,000 in 1966. Mortgage interest expense is also excluded.↩
2. For the years 1967 through 1974 the "total farm loss" includes real estate taxes totalling $912,028, all of which is carried as an "undistributed farm expense." For 1975 and 1976 the "total farm loss" includes real estate taxes totalling $317,432 of which $119,833 is allocated to the horse operations. No interest expense is included. ↩
1. Figures include expenses of maintaining Haflinger and Anglo-Arabian horses, see infra.↩
3. Figures not presented by financial statements.↩
5. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. * * * SEC. 167. DEPRECIATION. (a) General Rule.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business, or * * *↩
6. Further, the Court, accompanied by counsel for both parties, traveled to Lake County, Ill., where it visited the Tempel Smith Farm. During its visit, the Court had the opportunity to view the horses and their trainers, the farm's breeding operations, stables, and other physical facilities. After so viewing the farm, the Court was left with the impression that the horse operations were being conducted in a professional and businesslike manner. This impression was later confirmed after the Court heard the testimony and examined the exhibits presented at trial.↩